METROPOLITAN LIFE INS. CO. v.
SMITH et al.

No. 4773.

Circuit Court of Appeals, Seventh Circuit.

June 30, 1933.

Wm. J. Vesey and Fred B. Shoaff, both of Fort Wayne, Ind., for appellant.

John W. Eggeman, of Fort Wayne, Ind., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

The appeal is from a judgment for $25,800 upon four policies of insurance aggregating $25,000 issued by appellant April 20, 1926, upon the life of Richard J. McGreevey, Jr., who died November 12, 1929, while the policies were in force. To each policy there is attached a rider specifying that, in addition to the amount payable under the terms of the policy, a like amount shall be payable in case the death of the insured was "the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means," provided "(5) that death shall not have been the result of self-destruction, whether sane or insane, or caused by or contributed to, directly or indirectly, or wholly, or partially, by disease, or by bodily or mental infirmity; * * *" In the policies insured's father was named as beneficiary, but the right was reserved to the insured, without consent of the beneficiary, to assign the policies.

Insured assigned the policies, on March 16, 1927, to Citizens State Bank of Huntington, Ind., and on May 19, 1930, after having collected the original face of the policies, the bank, for a consideration, assigned them to appellee Helen C. Smith, a sister of insured. She brought the action upon the alleged liability under the riders of the policies, and the dominating question is whether there was any substantial evidence tending to show insured's death was accidental and not suicidal. This involves a consideration of the evidence.

Insured was thirty-four years old at his death and unmarried, and had rooms on the second floor of a residential building, the first

floor of which was the office of one of the several quite large local business concerns whereof he was the active head. He was a partner in the McGreevey Grocery Company, then in bankruptcy, with liabilities of $290,-000 and assets of $75,000; the managing head of Lime City Wholesale Company, in bankruptcy with liabilities of $144,000 and assets of $10,000; and president of Playtime Equipment Company, which at the time was defendant in about forty lawsuits and was borrowing money on its assigned accounts, and had several checks outstanding which would be presented probably on the day following and to meet which there was no money in the bank. The bankruptcy of Playtime Company followed shortly after his death. There were pending against him four indictments in the federal court for conspiracy to violate the bankruptcy laws. He held life policies aggregating over $280,000. Clearly his financial condition was desperate.

One of his two rooms on the second floor of the house referred to he used as his private office, and an adjoining room, with connecting door, was his bedroom. Shortly after 6:30 a. m. of November 12 an employee, following his practice of bringing the mail, came up the stairs and entered the private office. There he found insured on the floor on his left side, with his left hand under him and his right hand over him, and his face directly in front of and about a foot from a gas stove from which unlighted gas was escaping. He was dead. His body, clad in pajamas, was yet warm and without any marks or bruises upon it or anything to indicate that he had been assaulted or had fallen. His bed was disarranged as if it had been occupied. The windows and doors of the room were closed and the shades drawn.

There were two shut-off valves controlling the flow of gas to the stove, one in the supply pipe and one, a wheel valve, at the stove. Both of these had to be open to permit gas to flow through the stove. A man bending over the body found the gas flowing out of the stove, and stopped its flow by closing the wheel valve. There were found no burnt matches or other indications that the gas had been lighted or that there was attempt to light it.

The undisputed evidence establishes further that about the same hour on the morning of the previous day the same employee came to the private office and found McGreevey evidently ill from gas inhalation. He testified: "I found McGreevey in a chair on the north side of the room, sitting over the gas stove, his chair was as close up as he could get it and he was leaning over the stove in this position (indicating), leaning his head down over the stove; he seemed to be sick, but was conscious. The gas was turned on in that stove at that time, but was not burning."

He led McGreevey to his bedroom, and against his protest called a doctor, who came. The doctor (McGreevey's personal physician) came at about 7:30 and found him in his bed. He told the doctor that gas had been escaping and had given him a headache. The doctor asked him why his windows were shut if gas was escaping, and told him not to remain there if gas was escaping.

Analysis and discussion of these facts could not, in our judgment, lead to or even suggest any reasonable conclusion other than that this gas asphyxiation was the result of the insured's self-destruction, and was not accidental.

To combat this evidence resort is had to certain circumstances which the evidence tends to disclose. It appears that the gas stove was installed some time in September. It was testified that since its installation there had been some odor of escaping gas, and that efforts had been made to locate the leak through which the odor presumably came.

But this circumstance could have no reasonable bearing upon the large quantity of escaping gas present on these two mornings, nor influence the fact that both of the valves which controlled the gas inlet were open at the time in question. This was clearly not what would be termed a gas leakage, but a passage of unlighted gas through the intended outlet, in the normal way for causing it to flow, in quantity well known to persons of average intelligence to be sufficient to cause death in a very short time if the stove was not lighted. That whatever leak there had been did not cause this death is apparent from the fact that his occupancy of the premises as private office and bedroom during the several weeks on which it is contended there was gas odor in no wise caused him or anybody else any marked inconvenience.

It was further testified that insured was always of a cheerful disposition, that he was engaged to be married, had been with his fiancée the evening before his death, and left her saying he would see her the following day; and that he had made an engagement with one of his attorneys to confer soon after with reference to his trial which had been set for an early date, and that insured had expressed absolute confidence of his acquittal.

Also there was some contradiction as to whether one of the witnesses who testified to certain conversations with deceased had been impeached by evidence of differing statements; but the conversations which might have tended to establish suicidal intent we dismiss from consideration entirely; and we thus also ignore the contradicting or impeaching evidence respecting such conversations. These circumstances, in the absence of any tangible, substantial evidence of accidental death which they might tend to corroborate, do not of themselves tend to contradict the conclusion of suicide which we believe inevitably flows from the evidence of the actual facts.

Various cases were cited where courts have sustained recoveries under circumstances more or less resembling these. One case in particular is urged [Missouri State Life Ins. Co. v. Pater, 15 F.(2d) 737 (C. C. A. 7)], where this court declined to disturb a judgment against the insurer. Without here discussing that case, we may say of it, as of other border line cases depending upon the precise facts, that the conclusion reached on the peculiar facts there appearing does not afford a measuring stick for other cases with differing facts.

Considering all of the facts disclosed in the instant case, we have an abiding conviction that they point unerringly to the suicide of this man as the cause of his death. Thus convinced, we have no alternative but to reverse the judgment and remand the cause for a new trial, and it is so ordered.