## METROPOLITAN LIFE INS. CO. v. HOGAN.
### No. 4804.

Circuit Court of Appeals, Seventh Circuit.
Dec. 14, 1932.

Rudolph J. Kramer, Bruce A. Campbell, Roland H. Wiechert, and R. Emmett Costello, all of East St. Louis, Ill., for appellant.

C. W. Terry, Charles E. Gueltig, and M. D. Powell, all of Edwardsville, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and JOHNSON, District Judge.

SPARKS, Circuit Judge (after stating the facts as above).

The only controversy presented is whether insured died by his own hand or act within the purview of the suicide clause contained in the policy. If he did so die, appellee cannot recover; if he did not, the verdict and judgment must stand.

The presumption is that insured's death was not caused by suicide. Connecticut Mutual Life Insurance Co. v. Akens, 150 U. S. 468, 14 S. Ct. 155, 37 L. Ed. 1148.

Where the evidence shows that insured suffered injury which caused his death, and there is no proof from which it can be determined whether it was accidental or self-inflicted, the presumption still obtains that the injury was accidental and not self-inflicted. Wilkinson v. Ætna Life Insurance Co., 240 Ill. 205, 88 N. E. 550, 25 L. R. A. (N. S.) 1256, 130 Am. St. Rep. 269.

The burden is upon the insurer to overcome the presumption against suicide, and in order to do so the evidence must show that death was self-inflicted, or show such a state of facts which is inconsistent with any reasonable hypothesis of death by accident, or the existence of such circumstances as to leave room for no other reasonable hypothesis than that of suicide. Mutual Life Insurance Co. v. Graves (C. C. A.) 25 F.(2d) 705.

Insured was twenty-four years of age, and lived with his mother in four rooms above a confectionery store which she operated in Granite City, Ill. He was of a cheerful and happy disposition and in excellent health. He did not drink intoxicating liquors, and was seldom, if ever, without money; and so far as any one knew he had no financial or other troubles, and had made no threats of any kind to take his life. He, with some

other boys of the community, had a little club house on Chouteau Slough which they frequented for pastime. It was a fishing and boating resort.

Insured had never been married, and for about five weeks immediately preceding his death had been employed as a delivery man in his uncle's grocery and meat market at Venice, Ill., which was about three miles from Granite City. Each day he drove from his home to his employment in his own car, which was a Ford and practically new. His uncle's store was closed each afternoon from one to two o'clock, and insured usually ate his lunch at a confectionery nearby. He customarily, but not every day, bathed at the home of his uncle, and, at about 11:30 a. m. on the day of his death, he asked his aunt to have the water warm so that he might take a bath that afternoon as soon as they closed the store at six o'clock.

Some time in the morning of the day he died he telephoned his mother from his uncle's store and asked her to have his clothes ready for him, that he might take them with him and have them when taking a bath the next evening after finishing his work. About one o'clock on that day he came home and brought with him new underwear and new socks, stating that he could not wait until the next day to take his bath. Upon arriving home he left his car at the garage across the street from his home to have the carburetor adjusted. While there several members of the club to which insured belonged were considering going to the club and asked insured to take them. He replied that he was going to work that evening.

Shortly thereafter he went to his home across the street and came into the kitchenette, which was at the rear of his mother's storeroom. She asked him to eat lunch and he replied that he had had lunch. He then went into the back yard and played with some children a few minutes and returned to the garage. From there he rode uptown with a friend and two other boys in the friend's new car, and insured drove it. The friend was a member of the club above referred to. In a very short time they returned to the garage. While on this ride insured telephoned his uncle and asked permission to be off duty for a couple of hours, stating that he wanted to go out to the club house. His uncle granted the request, but instructed him to be back within that time as there were some deliveries to be made. Insured responded, "Oh, I will be back in that length of time, anyway." The record does not disclose whether insured

ever told his companions of the substance of the telephone conversation, or that he intended to take them to the club.

After arriving at the garage the last time, insured went home and his mother asked him what was the matter with the car, and he said, "nothing." He started upstairs and she asked him for what purpose he was going and he answered, "nothing."

The house in which he lived consisted of a store and kitchenette downstairs and the four living rooms upstairs, one of which was insured's bed room. The first room at the top of the stairs was a kitchen, and from it a door led into the sitting room, and from that room a door opened into insured's bed room.

After insured had been upstairs a short time his mother heard a noise like a fall, and she started upstairs, calling to him and asking what had happened. She found the outside kitchen door locked. She testified that he had a habit of locking that door whenever he went upstairs. With assistance the door was broken open. The other doors were neither locked nor closed. Insured was found dead, kneeling in front of his bed with his right arm upon it and his head resting on his right arm. His left arm extended down by his left side, and just beneath it on the floor was a revolver. He was left-handed. On two cartridges the hammer had snapped, and the third one had fired. There was a bullet hole over the left eye at the edge of the brow. The record does not disclose whether there were powder marks on the face.

The revolver had been in the family for a long time and had been given to insured's father as a keepsake. It was kept between the mattress and the feather bed on insured's bed, and his mother did not know of his ever having used it.

Under this statement of facts we think the case was properly submitted to the jury upon the question as to whether the circumstances disclosed preponderated in favor of suicide against the presumption that it was an accident. This was purely a question of fact, and it was for the jury to determine. It is of no consequence that we might think the facts preponderate in favor of suicide. The jury has determined that fact otherwise, and the only question presented for our consideration is whether the evidence shows a state of facts which is inconsistent with any reasonable hypothesis of death by accident, and which leaves room for no other reasonable hypothesis than that of suicide. There is no doubt that the facts are consistent with suicide; but they are also consistent with

an accident. The controlling fact, of course, is the insured's intention. There is no direct evidence on that point, and its determination must depend upon the surrounding circumstances.

When we consider the facts that insured was a young man of good habits and of jovial disposition, that he had employment and ready money, and no sickness or other troubles, that he was liked by his friends, and that within less than an hour before his death he made arrangements to spend two hours at his club, which was at a boating and fishing resort, we think it quite obvious that before he went to his room there was nothing to suggest the idea of suicide, unless it be the fact that he purchased a pair of socks and a suit of very light underwear before he came home and perhaps after he had telephoned his mother to have his clothes ready for his bath which he was going to take the following day. The jury evidently considered that fact as inconsequential, as indeed it might reasonably do.

The only evidence which tends strongly to support the suicide theory is the fact that he locked the outside kitchen door, and the further fact that there were two unexploded cartridges in the revolver which evidently some one had attempted to fire. His mother, however, testified that his custom was to lock that door whenever he went upstairs. That testimony, if true, might reasonably explain why the door was locked on this occasion. That evidence was uncontradicted, and the jury obviously thought it was a reasonable explanation.

There was no evidence, either direct or circumstantial, that showed or tended to show that insured at that time, or any other time, had attempted to fire the two unexploded cartridges. The gun was very old, and the mother, who gave the only testimony relative to its prior use, said she did not know of insured's ever having used it, except that lots of times, if they heard anything around the store, insured would get up and get the revolver and listen, if perchance he might hear or see anything further. It could not be considered unreasonable if insured had contemplated taking the revolver with him to the club house, and had examined it with that object in view; and it is quite within the realm of reasonable probability that there was an accidental firing of the gun which caused the tragedy.

The burden was upon appellant to overcome the presumption against suicide, and we cannot say that the facts presented are inconsistent with any reasonable hypothesis of death by accident, or that they leave room for no reasonable hypothesis other than suicide. Appellant's motion for a directed verdict was properly overruled.

Decree affirmed.