# JEFFERSON STANDARD LIFE INS. CO. v. CLEMMER.

## No. 3804.

Circuit Court of Appeals, Fourth Circuit.

Oct. 24, 1935.

Julius C. Smith, of Greensboro, N. C., and Laird L. Conrad, of Harrisonburg, Va. (C. R. Wharton, of Greensboro, N. C., Charles Curry, of Staunton, Va., and Smith, Wharton & Hudgins, of Greensboro, N. C., on the brief), for appellant.

S. D. Timberlake, Jr., of Staunton, Va. (Timberlake & Nelson and J. Wesley Taylor, all of Staunton, Va., on the brief), for appellee.

Before PARKER, and SOPER, Circuit Judges, and GLENN, District Judge.

SOPER, Circuit Judge.

This appeal is taken from a judgment of $20,000 rendered against the Jefferson Standard Life Insurance Company, defendant in the District Court, at the suit of the administrator of Harry Clemmer, deceased. A policy of insurance, in the sum of $10,000 was issued to Clemmer on June 6, 1932, with a double indemnity clause attached, providing for the payment of an additional $10,000 if death should occur to the insured directly and independently of all other causes from bodily injury, effected solely through external, violent, and accidental means; but this provision did not apply in case death should result from bodily injury inflicted by the insured, or intentionally by another person, or from self-destruction. On July 28, 1932, the insured was found in a locked bedroom, dead from a pistol wound in his forehead; the weapon lying in a pool of blood at his feet. The policy contained the general provision that in case of self-destruction, committed whether sane or insane, within one year from its date, the extent of recovery should be · the premiums paid. The company having declined to pay a claim for $20,000 presented by the administrator under the policy, the administrator brought suit for that amount, relying on the double indemnity clause. The company paid the premiums received into court, and defended the suit on the grounds, inter alia: (1) That the death was suicidal; and (2) that the insured had made false representations in his application for the policy, with respect to prior illnesses and medical and surgical attention received by him during the preceding five years.

At the trial, upon the conclusion of all the evidence, the defendant moved for a directed verdict in its favor, but this motion was denied and the issues were submitted to the jury. We are of opinion that it was error to refuse the prayer for a directed verdict, for the undisputed evidence tending to show suicide was clear and convincing, and left no other reasonable explanation of Clemmer's death. He would have been 30 years of age in September following his death. He was the son of well-to-do parents, and had been educated both in the academic and legal departments of Washington and Lee University, finishing in 1927. He had, however, never engaged in the practice of law, but, desiring to go into the hotel business, had accepted employment at the Stonewall Jackson Hotel and at the Stonewall Jackson Golf Club, organizations managed by his brother-in-law at or near Staunton, Va. He was described as a vigorous young man in good health, fond of athletics, and of a happy, buoyant disposition.

At the time of his death, Clemmer was clerk at the hotel, but was temporarily on a vacation. He was found dead in his room with the door locked on the inside, in a building adjacent the hotel, between 8 and 9 p. m., on July 28, 1932. Medical testimony indicated that the death occurred about 1 p. m. An hour before that time, he entered an adjacent room of a fellow

employee and requested him to go to the bank for coupons from bonds which the insured had deposited as collateral for a loan. The body was found seated on a side of the bed; the arms or elbows were resting on the thighs near the knees, and the feet were 18 to 20 inches apart. His head was inclined forward, so that his chin was close to his chest. He was clad in his underclothes. 'There was a round bullet hole in the center of his forehead on a line with the top of his eyes, about one-fourth of an inch in diameter. The bullet appeared to enter horizontally, but when the wound was probed later, it seemed to go in an upward direction, toward the back, at an angle of 15 to 20 degrees. A revolver was lying on the floor in a pool of blood, and under it there was a clear space showing that it had been dropped before the blood flowed. It was lying on the floor directly under the bullet wound in the head, and directly beneath the hands of the deceased.

Dr. Parkins, a witness on behalf of the plaintiff, testified that there was a dark discoloration around the wound of about an eighth of an inch in breadth, which, at the time, he took to be powder marks. On August 26, 1932, a month later, he signed and swore to a statement wherein he said that the wound, including the powder bruise, was about one-half an inch in diameter. At the trial, however, he said that it was dark in the room and he was not certain whether the discoloration was caused by powder marks or bruised blood. He wiped off the wound with a piece of cotton. While not knowing much about the difference between marks made by black powder and smokeless powder, he thought that marks made by the latter are not nearly so distinct and are more easily removed. The undertaker did not notice powder marks, but saw the discoloration around the wound.

Experts testified as to the nature of wounds made by weapons discharged close to the head, using black or smokeless powder. This evidence tended to show that the wound from a weapon held against the head is large and ragged, and burned from the powder and from the flash of the gasses. If black powder is used, powder burns are found when the weapon has been discharged within three inches or less of the skin. Smokeless powder within three inches leaves a smudge that can be wiped off. The reasonable inference from this testimony was that the pistol in this case was not discharged in contact with the forehead of the deceased, but from a short distance away.

The weapon was a 32.20 calibre Colt revolver, with a 4-inch barrel. It was fully loaded with smokeless cartridges, when found, except as to one exploded shell. A new box of cartridges was found on the dresser, and two or three cartridges were lying loose. The deceased had bought the box at a hardware store in Staunton three or four days before his death.

A pint bottle, one-half full of whisky, was found on the dresser, and some seven or eight similar empty bottles in a drawer of the dresser. There was much evidence that the young man was accustomed to the constant use of bootleg liquor, and, on occasions, was noticeably under its influence. Evidence as to his financial condition, given by his brother, indicated that the deceased had an undivided interest in the estate of his father, consisting in large part of farm lands, which gave him a net worth of about $10,000; but at the time of his death he was in need of ready money. He owed between twelve and thirteen thousand dollars to certain banks and small loan companies. One of these banks had made a call on him to reduce his indebtedness by a cash payment of $500. Signed promissory notes had been left with the bank by the mother of the deceased, so that the indebtedness might be renewed during her absence in Europe; but apparently the bank in question was not willing to renew without a curtailment of the indebtedness. During a period of a few days before his death, the deceased had given two or three $5 checks, one of which had been turned down for lack of funds. Five days before his death, he made an application to a small loan company for a loan of $300, and was granted a loan of $140. This loan was made without security; all of his available collateral being already pledged with the banks. There was evidence that during a short period before his death the deceased was worried and depressed in regard to the condition of a young woman he had gotten in trouble. He spoke to a physician about the matter, and said that he had sent the woman to some place for relief.

Blackwell, a fellow clerk at the hotel, testified that Clemmer on two occasions, within four or five months and three or four weeks, respectively, prior to his death, had made statements indicating that he was

contemplating suicide. Blackwell had been employed by the hotel in divers capacities, but was not in its employ at the time of the trial. He was questioned by his employer, the brother-in-law of Clemmer, and by an attorney, when they were seeking information relative to a claim against the insurance company two or three days after the death. He stated at the time that he did not want anything to do with the case, and did not want to tell anything about it one way or the other. The broth-in-law testified that Blackwell also said that he knew nothing about the case.

An attempt was made to discredit the testimony of Blackwell because of these earlier statements. However, the evidence of suicide is sufficient without giving consideration at all to Blackwell's testimony. A similar situation arose in Metropolitan Life Ins. Co. v. Smith (C. C. A.) 65 F.(2d) 967, 968, where the following was said:

"It was further testified that insured was always of a cheerful disposition, that he was engaged to be married, had been with his fiancee the evening before his death, and left her saying he would see her the following day; and that he had made an engagement with one of his attorneys to confer soon after with reference to his trial which had been set for an early date, and that insured had expressed absolute confidence of his acquittal.

"Also there was some contradiction as to whether one of the witnesses who testified to certain conversations with deceased had been impeached by evidence of differing statements; but the conversations which might have tended to establish suicidal intent we dismiss from consideration entirely; and we thus also ignore the contradicting or impeaching evidence respecting such conversations. These circumstances, in the absence of any tangible, substantial evidence of accidental death which they might tend to corroborate, do not of themselves tend to contradict the conclusion of suicide which we believe inevitably flows from the evidence of the actual facts."

Notwithstanding the weighty testimony in the pending case strongly indicating suicide, it is contended that other circumstances tended to show an accidental death, and required the submission of the issue to the jury. Clemmer had acquired the pistol when he was clerk or manager of the country club, some miles north of Staunton. When he was transferred to the hotel, he usually kept it in a vault in the office. Shortly before his death, he made two or more attempts to sell the weapon; and a few days before he took it to his room saying that he was going to clean it. Some lubricating oil was found in a bottle on the dresser, together with several partly filled bottles of toilet accessories, and two or three cloths or rags were found in the room. Dr. Parkins, the examining physician and coroner, took the weapon with him from the room and later found that it was sticky and rusty, and in need of oiling. From these circumstances it is suggested that Clemmer may have accidentally discharged the pistol while attempting to clean it. The condition of the pistol, however, was accounted for by the fact that it had lain for seven or eight hours in a pool of blood, estimated by the doctor to contain more than one gallon, and it is quite clear that Clemmer was not cleaning the pistol when shot, for it was fully loaded and there was no indication that he had used, or was preparing to use, the oil in the room for this purpose.

It is also suggested, relying upon the statement by one of the experts that such a weapon might possibly be discharged by a fall to the floor, that Clemmer accidentally dropped the revolver, and thereby received the fatal wound. This suggestion, however, is not reasonably tenable, not only because such an explosion is improbable, but because the position of the weapon immediately below the head of the deceased, obviously lying where it fell from his hands, indicated that it was not disturbed by the shock of an explosion upon contact with the floor. See Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105; Love v. New York Life Ins. Co. (C. C. A.) 64 F.(2d) 829, 831.

Dr. Parkins and Dr. Fulton, the physicians who examined the body shortly after it was discovered and before anything in the room had been disturbed, were both of the opinion after their examination that the case was one of suicide. Later on, during the period of investigation by the plaintiff with a view to a claim against the insurance company, doubts assailed them, and, when the time for trial was reached, they were able to testify that in their opinion death was accidental. This question, of course, was the very one that the jury was chosen to decide, and the opinion of the physicians was hardly admissible as evidence, since the circumstances were not such as to require medical

learning or experience. We are not at liberty to consider these opinions of probative force, and they are of value only in so far as they disclose a reasonable theory upon which death by accident might be based. The reason given by them for their change of attitude seems to us, on the contrary, to show that their later views had no sound basis. They said, in effect, that it was not possible for the insured to have intentionally shot himself and still remain in the position in which he was seated upon the bed. We find ourselves unable to give weight to this reason, for it is an admitted fact that after the shot and the death of the young man, the body remained seated upon the bed, with the head bent forward and the arms resting upon the thighs, and no reason is suggested or occurs to us why this result could not have followed an intentional as well as an accidental shooting. We have no doubt, after a painstaking examination of all the evidence in the case, that the death was caused by suicide, and we find no substantial ground for the submission of the theory of accident to the jury.

This conclusion disposes of this appeal on the broadest ground, but as the case must be remanded for a new trial under the federal practice, it becomes necessary to consider the objections to the judge's charge raised by the defendant. Support for the charge is found in prior decisions of this court, Tabor v. Mutual Life Ins. Co., 13 F.(2d) 765; Parrish v. Order of United Com. Travelers, 232 F. 425; nevertheless, we feel constrained to hold that it cannot be approved as a safe guide for the deliberation of the jury. They were told in substance that the evidence showed that the insured came to his death either from accident or suicide, no other theory being tenable under the circumstances; that the burden was upon the plaintiff to prove that death resulted from external, violent, and accidental means; that the plaintiff was not required to disprove suicide for the reason that there is a presumption of law against suicide, and, therefore, when death happens under circumstances which make it doubtful whether it was caused by accident or suicide, the presumption is that it was accidental; and this presumption is sufficient, in the absence of evidence to the contrary, to sustain the burden of proof as to accidental death; and when the defendant denies that death was accidental, and asserts that it was suicidal, the burden rests upon the defendant to produce evidence to overcome the presumption of accident and to satisfy the jury that the death was suicidal; and that this burden upon the defendant is met when the jury is satisfied that there is no other reasonable explanation of the death but suicide.

It will be observed that the District Judge in his charge defined the effect of the presumption against suicide upon the burden of proof, and the amount of the proof required to establish suicide when it becomes an issue of fact in a trial upon a life insurance policy containing a double indemnity clause. On these subjects, there is great diversity in the decisions of the federal courts, not only in the rules announced in the several circuits, but also at different times in the same circuit. Much of the confusion has arisen by treating the presumption itself, under some conditions, but not under all, as evidence of the fact presumed; that is, as an inference to be considered with the other facts in the case tending to show accidental death. Thus it has been said that when the cause of death is unexplained or undisclosed by evidence, or when evidence tending to prove self-destruction is contradicted or impeached, or some evidence adduced is inconsistent with a reasonable hypothesis that death was not self-caused, the presumption against suicide may prevail.[1] This statement must mean that when there is evidence both ways, some consistent with the theory of suicide and some consistent with the theory of accident, the weight of the presumption, treating it as an inference of fact, is added to the latter; and its probative value has been held in many cases to be so great that in order to overcome it, the evidence must leave no room for any other reasonable hypothesis than that of suicide.[2] Nevertheless, it is quite generally held that when the uncontradict-

[1] New York Life Ins. Co. v. Anderson (C. C. A.) 66 F.(2d) 705; New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457, 458; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680. Compare Travelers' Ins. Co. v. Wilkes (C. C. A.) 76 F.(2d) 701.

[2] Mutual Life Ins. Co. v. Graves (C. C. A.) 25 F.(2d) 705; Tabor v. Mutual Life Ins. Co. (C. C. A.) 13 F.(2d) 765; Ætna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243; New York Life Ins. Co. v. Alman (C. C. A.) 22 F.(2d) 98; Burkett v. New York Life Ins. Co. (C. C. A.) 56

ed evidence shows that death was self-inflicted, and excludes every reasonable hypothesis of death from any other cause, the presumption does not prevail and the judge must direct a verdict for the defendant.[3]

From these views, two consequences have flowed that seem to be out of harmony with usually accepted tenets of the law. The burden of proof to show suicide has been placed upon the defendant in suits in which the plaintiff relies upon death by violent, external, and accidental means, independent of all other causes;[4] and, in order to succeed, the defendant must prove intentional self-destruction by evidence which excludes every other reasonable hypothesis of death; or, in other words, must prove it beyond a reasonable doubt just as in criminal cases the proof of guilt must exclude every reasonable hypothesis of innocence.[5]

It is obvious that these rules are not easy for judge or jury to apply. It is difficult to understand how any amount of testimony can utterly destroy the force of an inference so powerful that, with any substantial supporting evidence, it will overcome the effect of all opposing evidence. In one situation it amounts to substantial evidence per se, while in the other it amounts to nothing at all. The explanation is that otherwise there would be no case of suicide in which it would be proper for the trial judge to direct a verdict for the insurer, and the courts have been unwilling to go that far. Even when a case is submitted to the jury under these rules, its function would seem to be confined merely to a consideration of the truth of the testimony, for if there is any credible testimony in the case which tends to support a reasonable hypothesis of accident, the jury must find a verdict for the plaintiff.

These reflections lead us to adopt the sounder view that the presumption against suicide is not evidence at all, but is a rule of law which in a case of this kind requires the conclusion, in the event of an unexplained death by violent injury, that the death was not suicidal until credible evidence of self-destruction is offered. When such evidence is offered, whether it be in the course of the plaintiff's proof or by the defendant, the presumption as a rule of law disappears from the case and the trier of facts passes upon the issues in the usual way. When unexplained death by violence is shown, a defendant who seeks to avoid liability on the ground of suicide has the burden of going forward with the evidence or the issue of suicide will go against him, but if he offers such evidence, the burden of persuading the jury that death resulted from accident independent of suicide and all other causes remains with the plaintiff, if it rested upon him at the beginning, as in a suit upon an accident insurance policy. This phase of the trial is well described by Professor Wigmore in his formulation of the rules applicable to presumptions, as follows: "The important thing is that there is now no longer in force any ruling of law by the

F.(2d) 105; Love v. New York Life Ins. Co. (C. C. A.) 64 F.(2d) 829; New York Life Ins. Co. v. Trimble (C. C. A.) 69 F.(2d) 849; Metropolitan Life Ins. Co. v. Hogan (C. C. A.) 62 F.(2d) 135; Prudential Ins. Co. v. Baciocco (C. C. A.) 29 F.(2d) 966; New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680; Ocean Accident & Guar. Corp. v. Schachner (C. C. A.) 70 F.(2d) 28.

[3] Proctor v. Preferred Acc. Ins. Co. of New York (C. C. A.) 51 F.(2d) 15; American Nat. Bank v. Continental Cas. Co. (C. C. A.) 70 F.(2d) 97; Von Crome v. Travelers' Ins. Co. (C. C. A.) 11 F.(2d) 350; New Amsterdam Cas. Co. v. Breschini (C. C. A.) 64 F.(2d) 887; Frankel v. New York Life Ins. Co. (C. C. A.) 51 F.(2d) 933; Wirthlin v. Mutual Life Ins. Co. (C. C. A.) 56 F.(2d) 137, 86 A. L. R. 138; and cases cited in previous notes.

[4] Mutual Life Ins. Co. v. Graves (C. C. A.) 25 F.(2d) 705; Tabor v. Mutual Life Ins. Co. (C. C. A.) 13 F.(2d) 765; New York Life Ins. Co. v. Alman (C. C. A.) 22 F.(2d) 98; New York Life Ins. Co. v. Ross (C. C. A.) 30 F.(2d) 80; Tschudi v. Metropolitan Life Ins. Co. (C. C. A.) 72 F.(2d) 306; Prudential Ins. Co. v. Baciocco (C. C. A.) 29 F.(2d) 966; see, also, Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; compare Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105; Love v. New York Life Ins. Co. (C. C. A.) 64 F.(2d) 829; Ocean Acc. & Guar. Corp. v. Schachner (C. C. A.) 70 F.(2d) 28; United States F. & G. Co. v. Blum (C. C. A.) 270 F. 946; Frankel v. New York Life Ins. Co. (C. C. A.) 51 F.(2d) 933; Missouri State Life Ins. Co. v. West (C. C. A.) 67 F.(2d) 468; Travelers' Ins. Co. v. Wilkes (C. C. A.) 76 F.(2d) 701.

[5] See cases cited in Note 2.

judge requiring the jury to find according to the presumption. All is then turned into an ordinary question of evidence, and the two or three general facts presupposed in the rule of presumption take their place with the rest, and operate, with their own natural force, as a part of the total mass of probative matter. The main point to observe is that the rule of presumption has vanished; because its function was as a legal rule, to settle the matter only provisionally, and to cast upon the opponent the duty of producing evidence, and this duty and this legal rule he has satisfied." Wigmore on Evidence, § 2487, vol. 5, p. 445.

When the case goes to the jury, they are at liberty to take into consideration the abnormality of suicide and to give such probative force, as their judgment dictates, to the fact upon which the presumption is based, that is, in a case of this sort, to the fact of death by violence; but "it is not weighed down by any artificial additional probative effect; they may estimate it for just such intrinsic effect as it seems to have under all the circumstances." Wigmore on Evidence, § 2491, vol. 5, p. 453. See, also, Mobile, J. & K. C. R. Co. v. Turnipseed, 219 U. S. 35, 43, 31 S. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463; New York Life Ins. Co. v. Ross (C. C. A.) 30 F.(2d) 80; New York Life Ins. Co. v. Anderson (C. C. A.) 66 F. (2d) 705; Frankel v. New York Life Ins. Co. (C. C. A.) 51 F.(2d) 933; Wirthlin v. Mutual Life Ins. Co. (C. C. A.) 56 F.(2d) 137, 86 A. L. R. 138; Missouri State Life Ins. Co. v. West (C. C. A.) 67 F.(2d) 468; Equitable Life Assur. Co. v. Halliburton (C. C. A.) 67 F.(2d) 854; Brunswick v. Insurance Co., 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213; Griffith v. Continental Cas. Co., 299 Mo. 426, 253 S. W. 1043; Lisbon v. Lyman, 49 N. H. 553; Travelers' Ins. Co. v. Wilkes (C. C. A.) 76 F.(2d) 701.

It is held by eminent law-writers that it is stating the rule too broadly to say, in respect to all presumptions, that the burden of persuasion, as distinguished from the burden of going forward with the evidence, never shifts from the proponent to the party against whom a presumption is invoked; for example, the presumption of legitimacy of a child born in wedlock has quite generally been held to impose upon the person against whom it operates the burden to prove the contrary by something more than a mere preponderance of the evidence; and in every case, it is said, the effect of a presumption upon the burden of persuasion should depend upon the purposes for which the presumption was created. See the discussion by Francis H. Bohlen, 68 U. of Pa. L. Rev. 307, 319; Edmund H. Morgan, 44 Harv. L. Rev. 906 to 934, 921, 924, 47 H. L. Rev. 59, 83; R. R. Ray and C. T. McCormick, 13 Tex. L. Rev. 33, 56.

We are concerned in the pending case only with the presumption against suicide, and our decision is confined to that subject. That presumption is based upon nothing more than the fear of death so generally entertained by mankind that it is reasonably safe to conclude, in the event of an unexplained death by violence, that suicide was not the cause. The crystallization of this balance of probability into a presumption of law may have been due, as has been suggested, to the desire of the English courts to avoid the forfeiture of the goods and chattels of a suicide and the ignominious burial of his body which the law required. See Blackstone's Commentaries, Book 4, Cooley's Ed. pp. 189, 190; 19 Marquette L. Rev. 20, 24, 25. Certainly the presumption is not based upon any difficulty of producing the evidence or the especial accessibility of the evidence to one of the parties, or upon the judgment of the courts as to what is socially desirable. Obviously, the presumption is not needed in order that justice may be done to the beneficiaries or the representatives of the deceased, for jurors do not need to be told that suicide is abnormal, or warned to be fair to the plaintiff in a suit on a life insurance policy.[6]

Ordinarily, it is not necessary to refer to the presumption against suicide in the charge to the jury. If the basic fact of death by violence is admitted, or proved, the presumption arises, and in the absence of countervailing evidence, the judge should direct a verdict for the plaintiff.[7] If such evidence is produced, the judge should charge the jury in the usual fashion. He may of course refer in his discretion to the improbability of suicide as an inference of

---

[6] The existence of the presumption as a rule of law has been denied in the recent case of Watkins v. Prudential Ins. Co., 315 Pa. 497, 173 A. 644, 95 A. L. R. 869.

[7] If the basic fact is disputed, it is necessary to instruct the jury as to the effect of the presumption.

fact, based on the common experience of mankind, but the jury should be permitted to give the inference such weight as it deems best, undisturbed by the thought that the inference has some sort of artificial probative force which must influence their deliberation. Likewise as to the opposing evidence, the jury should be instructed to weigh its credibility and effect in the usual way, and finally, upon the whole evidence, to determine whether death by accident has occurred, bearing in mind that if the evidence leaves their minds in such doubt that they are unable to decide the point, the verdict should be against the party upon whom the burden of persuasion rests. Such a charge can be easily understood and enables the jury to do justice to both sides. But when the court goes further and introduces the presumption itself as evidence to be considered by the jury, or places the burden on the defendant to satisfy the jury by a preponderance of evidence, he states the principle too strongly and may cause a miscarriage of justice; and a fortiori, when he imports into the trial the rule of reasonable doubt applicable in prosecutions for crime, he makes it will-nigh impossible for the jury to find for the defendant. The result has been in many cases of self-destruction to be found in the books, that judge and jury alike have been unable to take a common-sense view of the facts of life, and have seemed to be the only persons in the community who did not clearly understand what had taken place.

It is contended that it was settled by the Supreme Court in Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308, that the burden of proof as to suicide in an accident insurance case is on the insurer. In some jurisdictions, this view has been reluctantly given effect. New York Life Ins. Co. v. Ross (C. C. A.) 30 F.(2d) 80. In others, it has been ignored. (See the cases in note 4). The case, therefore, has not uniformly been recognized as binding authority for the rule that the burden of proof is upon the defendant. Moreover, it is generally agreed that in later cases, Agnew v. U. S., 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624, and Holt v. U. S., 218 U. S. 245, 253, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138, the Supreme Court corrected the impression it had given in Coffin v. U. S., 156 U. S. 432, 460, 15 S. Ct. 394, 39 L. Ed.

481, that, in our system of jurisprudence, a presumption of law should be treated as evidence, giving rise to proof to the extent of its efficacy.

The differences that have arisen as to which party bears the burden of persuasion in insurance cases, when the defense is based on suicide, have been caused in part by a failure to distinguish between cases in which the plaintiff sues on an accident insurance policy or the double indemnity clause of a life insurance policy, and cases in which the insurer in a life policy raises the defense of suicide. If death from any cause except suicide is insured against, the burden is on the company to prove the exception; but if death from one specific cause, such as accident, is insured against, the burden is on the policy-holder to show that the condition precedent to liability has taken place. Home Benefit Ass'n v. Sargent, 142 U. S. 691, 12 S. Ct. 332, 35 L. Ed. 1160; Parrish v. Order of United Commercial Travelers (C. C. A.) 232 F. 425; Travelers' Ins. Co. v. Wilkes (C. C. A.) 76 F.(2d) 701; Wigmore on Evidence, § 2510 (b) (c). Compare cases in note 4. The incidence of the burden of persuasion in these cases is governed by the general principles relating to the subject unaffected by the presumption against suicide.

Difficulty may seem to arise where both features are combined in one contract, as in the instant case which involves a life insurance policy with double indemnity in case of death from bodily injuries effected through external, violent, and accidental means. In a suit upon such a policy, the plaintiff may rely upon accidental death by external violence as a basis for the recovery of double the face of the policy, and the defendant may rely on suicide as a defense to the entire claim. In such event, it is clear that the burden of persuasion rests upon the plaintiff to bring himself within the double indemnity provision, and upon the company to bring itself within the protection of the suicide clause, and it becomes necessary to apply these rules so that they do not conflict with one another and confuse the trier of facts. There is, in reality, no conflict between them. If the jury are satisfied by a preponderance of the evidence that the death was accidental, their verdict should be for the plaintiff for the full amount. If, on the contrary, they are satisfied by the same measure of proof

that the death was suicidal, they should find a verdict for the defendant. Finally, if their minds are in a state of equipoise, and they are unable to determine upon the evidence before them whether the death was accidental or suicidal, they should not find a verdict for the full amount of the claim, but only for the face of the policy; for, in such event, the plaintiff will have failed to meet the burden of persuasion as to accident, and the company will have failed to meet the burden of persuasion as to suicide. Of course if the plaintiff foregoes his claim for double indemnity, and limits the suit to a single liability, the burden of persuasion is on the company; and, on the other hand, if the company admits single liability and the contest is over the double indemnity, the burden of persuasion is on the plaintiff. Compare Jefferson Standard Life Ins. Co. v. Jefcoats, 164 Miss. 659, 143 So. 842; New York Life Ins. Co. v. Anderson (C. C. A.) 66 F.(2d) 705; Messervey v. Standard Acc. Ins. Co. (C. C. A.) 58 F.(2d) 186.

■ For another reason, irrespective of the question of suicide, we think that the defendant in the District Court was entitled to a directed verdict. The insured, in his application on May 28, 1932, in answer to the question whether he had been disabled or had received medical or surgical treatment within the past five years, replied, "No." He also stated specifically that he had not had a number of specified diseases, including, amongst others, syphillis or stricture, and finally stated that he had not consulted a doctor for any cause not included in his answer to these questions. The truth was that he had been treated by physicians during the 5-year period, once in 1928 for irritation of the bladder, and again in 1929 for gonorrhea. He had also had an attack of gonorrhea in 1924 previous to the 5-year period. It is contended on behalf of the policyholder that these misstatements of the insured should be disregarded on account of evidence tending to show that the answers were not made by the insured, but without his knowledge were inserted in the application by the agent of the company. It is not necessary to consider the effect of the evidence in this respect, for even if it should be found strong enough to support the contention, the rights of the parties would not be affected. The application was made a part of the contract of insurance delivered to the insured, and thereby he became charge-

able with knowledge of the contents and responsible for the information given over his signature to the company. New York Life Ins. Co. v. Fletcher, 117 U. S. 519, 529, 6 S. Ct. 837, 29 L. Ed. 934; Lumber Underwriters v. Rife, 237 U. S. 605, 609, 35 S. Ct. 717, 59 L. Ed. 1140; New York Life Ins. Co. v. Stewart (C. C. A.) 69 F.(2d) 957; Flannagan v. Mutual Ins. Co., 152 Va. 38, 62, 146 S. E. 353.

The medical director of the defendant company and the medical director of the Shenandoah Life Insurance Company each testified that, under the general custom and usage of life insurance companies, gonorrhea is considered a serious disease, involving a considerable hazard, and if inquiry should show a history of an irritation of the bladder and a second attack of gonorrhea, it would be the customary practice to make a thorough microscopic examination, and, in most cases, either to decline the application or to increase the standard rate, according to the conditions found. They also testified that according to enlightened medical opinion, it is at least doubtful whether the disease is ever entirely eradicated, and that if a patient has had two attacks, it is usually followed in middle life by an enlarged or abcessed prostate and concomitant troubles. The only testimony opposed to this was given by an insurance agent or underwriter who had had experience for twenty years in writing life insurance, and for a period of two years had acted as district manager for a life insurance company. The precise effect of his testimony it is difficult to state. First declaring that he knew only the practice of his own company, he later said he was acquainted with the usages of insurance companies generally; and that they did not rate or reject an applicant who had had gonorrhea. "As to whether he had it twice, it is the practice of the companies I have come in contact with, they don't consider gonorrhea very serious."

Upon the completion of the testimony, the insurance company moved for a directed verdict on the ground that the misrepresentations of the insured satisfied the terms of the Virginia Statute (Code, § 4220), which provides, in substance, that no statement in the application for a policy of life insurance shall bar recovery thereon unless it is clearly proved to be material to the risk. This motion the court denied, leaving the question of materiality to the

jury, to be determined by deciding whether the truth as to the past diseases of the insured, if communicated to the insurer at the time of the application, would have caused insurance companies generally to reject the risk altogether, or to increase the premiums.

This charge set out in substance the generally accepted definition of materiality as applied to life insurance; but, in our opinion, the facts were not such as to justify the submission of the issue to the jury. The evidence was clear and convincing that if the applicant had given a true account of his medical history, further investigation would have been considered necessary by a careful insurer in order to determine on what terms, if any, the risk should be accepted; and there was no substantial testimony to the contrary on this point, even if it be supposed that a policy writing agent without medical experience is qualified to describe the kind of risks generally considered insurable by medical experts. The bearing of these facts upon the assumption of the risk by the company was no less material than if the applicant had divulged the diseases and refused an examination. In that case, the application would of course have been rejected, while here the company was burdened with the risk unwittingly and had no opportunity to pass upon it.

█ It is of no consequence that the facts suppressed had no causal connection with the death of the insured, for they affect the very origin of the insurance contract, and, except for them, the contract would not have been made. In Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co. (C. C. A.) 72 F. 413, 428, 38 L. R. A. 33, Taft, Circuit Judge, said: "Materiality of a fact, in insurance law, is subjective. It concerns rather the impression which the fact claimed to be material would reasonably and naturally convey to the insurer's mind before the event, and at the time the insurance is effected, than the subsequent actual causal connection between the fact, or the probable cause it evidences, and the event. Thus, it is by no means conclusive upon the question of the materiality of a fact that it was actually one link in a chain of causes leading to the event. Watson v. Mainwaring, 4 Taunt. 763; Jones v. Insurance Co., 3 C. B. (N. S.) 65; Rose v. Insurance Co., 2 Ir. Jur. 206; Insurance Co. v. Schultz, 73 Ill. 586. And,

on the other hand, it does not disprove that a fact may have been material to the risk because it had no actual subsequent relation to the manner in which the event insured against did occur. A fair test of the materiality of a fact is found, therefore, in the answer to the question whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against. The best evidence of this is to be found in the usage and practice of insurance companies in regard to raising the rates or in rejecting the risk on becoming aware of the fact."

The importance to the insurer of the free exercise of its undoubted right to select the risks which it desires to insure is well described in the following statement from Mutual Life Ins. Co. v. Hurni Packing Co. (C. C. A.) 260 F. 641, 645: "A chief part of any insurance company's business is a discrimination in selecting risks lest the natural and average losses may be exceeded. The purpose of the inquiries made as to prior consultations or treatments by physicians is to furnish to a life insurance company the information, either that the applicant has had continuous prior good health or the names of the practitioners consulted, so that the company may decide what further inquiries should be made in view of such disclosures. That such consultations were for what seemed to the applicant or his physician but trivial ailments is beside the question. It is the materiality to the company's investigation and decision as to acceptance of the risk that is involved. Inquiries as to prior attacks necessitating the attendance of physicians may disclose information not to be found by the medical examiner's own efforts. The history of the patient may be quite essential to supplement a physical examination."

█ These statements of the law may not be taken, and were not intended to be taken, so broadly as to defeat the purpose of state statutes like section 4220 of the Virginia Code, which have been quite generally enacted to relieve against the hardships arising from the strict enforcement at common law of warranties in insurance policies concerning matters of no real relation to the risk assumed. See Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co. (C. C. A.) 72 F. 413, 418, 38

L. R. A. 33. Moreover, the Supreme Court of Appeals of Virginia, whose interpretation of the Virginia statute we are bound to follow [see Ætna Life Ins. Co. v. Moore, 231 U. S. 543, 553, 34 S. Ct. 186, 58 L. Ed. 356; New York Life Ins. Co. v. Cravens, 178 U. S. 389, 395, 20 S. Ct. 962, 44 L. Ed. 1116; Union Indemnity Co. v. Dodd (C. C. A.) 21 F.(2d) 709, 55 A. L. R. 735], has construed the Virginia statute with that purpose in view. Thus in Modern Woodmen v. Lawson, 110 Va. 81, 65 S. E. 509, 135 Am. St. Rep. 927, the court had under consideration the Virginia statute in an earlier form which provided that the answers of an insured in his application should not bar the right to recovery upon the policy unless clearly proved to be willfully false or fraudulently made or material; and the court ruled that a false answer by the applicant that he had not been treated for seven years by a physician, whereas a short time before his death he had gotten a prescription from a physician for billiousness, did not avoid the policy, holding that such a false statement concerning a mere temporary indisposition not affecting the general health of the applicant would not vitiate the policy unless clearly proved to be willfully false or fraudulent or material. On the other hand, it was held in Flannagan v. Mutual Life Ins. Co., 152 Va. 38, 60, 68, 146 S. E. 353, 361, a case in which suicide was charged, that a false concealment as to a treatment by a physician for a nervous disorder was material to the risk. The court made the following statement, which is particularly pertinent to the suppression of facts in the case at bar: "It is also true that, had the bare outline of this situation been revealed to the insurance company, it would either have rejected the risk out of hand, or would at least have made an independent examination. In any event, the company was entitled to an opportunity to make such an examination, and the concealment of facts which would have put it on notice was a concealment of facts material to the risk."

See, also, New York Life Ins. Co. v. McCarthy (C. C. A.) 22 F.(2d) 241, 244; New York Life Ins. Co. v. Hunter (C. C. A.) 32 F.(2d) 173, 175; New York Life Ins. Co. v. Stewart (C. C. A.) 69 F.(2d) 957; Mutual Life Ins. Co. of N. Y. v. Ontario Metal Prod. Co., L. R. [1925] A. C. 344.

Reversed and remanded.