## NEW YORK LIFE INS. CO. v. MALLOY et al.

### No. 306.

District Court, D. New Hampshire.

Jan. 27, 1938.

Jonathan Piper and Fred C. Demond (of Demond, Woodworth, Sulloway, Piper & Jones), both of Concord, N. H., for Insurance Company.

Crawford Hening and Matthew Ryan, both of Berlin, N. H., for Malloy.

MORRIS, District Judge.

This is a bill in equity brought by the New York Life Insurance Company of New York City, against Edward T. Malloy and Thomas E. Malloy, both of Gorham, N. H., for a rescission and cancellation of certain provisions of four policies of insurance issued on the life of Edward T. Malloy, one of which is attached to the bill and the other three being of the same tenor and effect.

The provisions of the policies sought to be canceled are those relating to disability and double indemnity benefits. Other provisions of the policies have become incontestable by lapse of time.

The grounds set forth in the bill of complaint are fraud and misrepresentation in the applications for insurance.

The four policies, each for the sum of $2,500, were issued on the 12th day of March, 1929, when Edward T. Malloy was a student at the University of Maine at Orono in that state. The application was made, the first premium was paid, and the policies were delivered in Maine, and must be governed by the laws of that state with respect to form and validity of the contracts.

The particular provisions of the applications upon which the allegations of fraud are founded read as follows:

"7–a. Q. Have you ever had any accident or injury or undergone any surgical operation? A. No.

"8. Q. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of—b—the heart, blood vessels or lungs? A. No.

"11. Q. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? A. None."

The application further contains an agreement signed by the insured as follows: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them."

I find the following facts:

The policies were issued on March 12, 1929. At the time Edward Malloy was 26 years of age. The policies were solicited in Orono, Me., by an agent of the insurance company who resided in Houlton, that state. The physical examination was made by Dr. Clayton Bayard at his office in Orono. The application was made by Edward T. Malloy without consulting his father, Thomas E. Malloy, although the father paid the premiums.

In the fall of 1920, Edward was enrolled as a student at St. John's Preparatory School at Danvers, Mass., at the time he was suffering from a severe cold and cough which he contracted on a trip to Mt. Washington. He consulted Dr. McGeeof Berlin, the family physician, with reference thereto, and was told that he was suffering from "bronchial trouble or bronchitis or something like that that I had."

Edward did not remain at the prep school but a short time. When he returned his father and mother apparently were much concerned about his state of health, and in November, 1920, he was taken by his father to a tuberculosis clinic conducted by Dr. Wise in Berlin, N. H.

The records of the clinic disclose that Edward had been suffering from a cough for a period of three years and emitting a greenish sputum. The diagnosis recorded at the clinic shows "Tuberculosis, Incipient." The nurse who had the case in charge made several trips to Malloy's home in Gorham and gave advice as to the treatment of the patient, which appears to have been followed. According to the history chart, only two visits were made to the clinic by Edward and his father. The second and last visit was made on February 22, 1921, when the doctor recorded a diagnosis of "Incipient Tuberculosis—Improved—No rales." Following this examination the nurse in charge wrote on the face of the card, after the word "incipient," the word "Arrested," inclosed in parenthesis. Just when this was done does not appear.

From the foregoing, I find that Edward T. Malloy when approximately 17 years of age, had incipient pulmonary tuberculosis which responded to treatment and eventually was found to be arrested.

He was not told by his parents or any one else the result of the examination at the T. B. clinic, and, so far as appears from the evidence, he never knew the result until some years later.

Such an unusual series of events must have left a lasting impression on Edward's mind as to his then condition of health.

In the fall of 1921, Edward attended the high school in Gorham and continued until the summer of 1923, when he graduated. During the school year of 1920, he did not attend school.

He played on the high school football team in the fall of 1918, 1919, 1921, and 1922. In the fall of 1923 he entered college. Physical examinations for military training were required. He successfully passed the test for the years 1923, 1924, 1925, 1927, and 1928. In the fall of 1928 he started taking the regular military course, and continued for a few weeks when he went to the Major in charge and asked to be excused from military science and military training. The excuse that he gave was that he had a bruised shin bone, but his real excuse, as he testified, was because of inability to keep up his military course and graduate in 1929. He was told that he could be excused only on the certificate of the military doctor. He went to Doctor Herlihy, who sent him to Dr. Ford, and Dr. Ford sent him to Dr. Woodcock, who

was not one of the examining physicians at the University.

From the testimony of Dr. Allen Woodcock I find that Edward Malloy was examined by him on September 21, 1927. Malloy's complaint at the time was that he had been kicked in the shin while playing football four years previous; that two years ago he fell on a board and struck the same spot, and it gave him more or less trouble and he desired a certificate from the doctor to allow him to omit his military training. An X-ray showed a bone growth on the shin. A certificate was granted, but soon thereafter it was revoked by the military department because they saw him playing football. Malloy was again examined by Dr. Woodcock on September 18, 1928, for the same purpose. A certificate was granted, and he was excused from military training. Dr. Woodcock made no complete physical examination of Malloy, and never treated him for anything. Malloy remained in college for six years, and finally graduated in 1929.

On February 11, 1928, Thomas E. Malloy, the father, made arrangements for his own physical examination by Dr. Thomas J. Burrage of Portland, Me. Edward had been talking about leaving college and at the request of his father they met at Dr. Burrage's office, and after the completion of the father's examination he requested the doctor to make a complete physical examination of his son, and he told the doctor that Edward was said to have had pulmonary tuberculosis, and requested the doctor not to mention it to him. The examination was made lasting from an hour and a quarter to an hour and a half. The only complaint mentioned by the boy was that he was feeling tired after his midyear examinations.

An examination of the boy's lungs disclosed, "slight dullness, bronchial breathing but no rales, at right apex above clavicle in front and scapula behind." This was diagnosed as evidence of healed tuberculosis. Further examination disclosed "poor liver function and septic tonsils." The liver disorder was diagnosed as functional and not organic. He was advised to have his tonsils removed. In summing up his report he says he found the boy in excellent physical condition.

Dr. Clayton H. Bayard of Orono, Me., was the examining physician for the New York Life Insurance Company in 1928 and 1929, and one of the medical examiners for

the college. He stated that during the period 1929 he examined from twenty to thirty students for his company; that usually the applicants were brought to his office personally by William J. Whited, an agent for the company, who remained in an outer room while the examinations were going on. On March 9, 1929, Edward T. Malloy was examined by Dr. Bayard, who filled out the application for the insurance in question. Dr. Bayard, by reason of his connection with the College, knew its requirements with reference to examinations for military training, and it was not his practice, in passing upon student applications for insurance, to mention, in answer to question 11, the names of the physicians connected with the college, as he considered such examination a part of the college course and he was accustomed to write the word "none" in answer to the question.

Apparently the names of Dr. McGee, Dr. Woodcock, and Dr. Burrage were not disclosed to Dr. Bayard. However, it does not appear that Dr. McGee had been consulted within five years next prior to the date of the application.

Dr. Edward J. Campbell of New York City, chief medical examiner for the New York Life Insurance Company, testified that, acting in accordance with the practice and custom of life insurance companies, had he known the applicant had been examined at a tuberculosis clinic and incipient pulmonary tuberculosis found, and if he had known that Dr. Burrage had found healed symptoms of the disease and septic tonsils with a functional liver disorder, and that the applicant complained of being tired following midyear examinations, and that he had had an injury to his shin bone which had resulted in a lime deposit on the bone, and that he had been excused from taking military training in 1929, the insurance policies in question would not have been issued without further investigation, and, if the investigation had disclosed the medical history as found, the applications would have been declined. I find this to be a fact.

I am satisfied and so find that Edward T. Malloy was kept in ignorance of the fact that he had had incipient pulmonary tuberculosis which had been arrested until some time after the application for insurance was filled out; but the facts relating to the examination of his chest at the clinic and what followed are matters that must have been within his memory, and should have been disclosed.

■ I find as a fact that Malloy was not guilty of any fraud or misrepresentation in not disclosing the names of the medical examiners for military training in connection with his college course. He considered that Dr. Bayard was familiar with rules of the college, its requirements with reference to military training, and he relied on him to make the proper answers to question No. 11, in so far as it related to such medical service.

While Dr. Woodcock was not in any way connected with the college, his examination was made in connection with college activities and related only to an examination of the leg injury. No treatment was sought or given.

■ The thorough physical examination given by Dr. Burrage February 11, 1928, appears to be of more importance. This examination, less than a year and a month prior to the date of the application for insurance, March 9, 1929, must have been in the mind of the applicant at the time he applied for the insurance in question. Edward was 26 years of age, a senior in college, and certainly presumed to understand the English language. The question on the application plainly called for the "names of the practitioners or physicians" whom he had "consulted or been examined or treated by within the past five years." His answer to this question was "None," and his only excuse is that he forgot to name Dr. Burrage. This lapse of memory is inexcusable and cannot be accepted as the real reason.

If Dr. Burrage's name had been disclosed it would have given the insurance company a means of obtaining an accurate picture of Malloy's physical history.

I cannot find that the omission of Dr. Burrage's name was other than intentional, and that it does in fact constitute a concealment of a material fact.

The questions in the application to be answered by the applicant are not meaningless. They furnish the information to be considered by the insurance company and furnish the foundation facts upon which an application for insurance is granted or denied. The testimony shows that if Dr. Burrage's name had been mentioned the company would have contacted him to ascertain why the examination was necessary and obtain a full report of the disclosed "incipient tuberculosis, arrested." doctor's findings. This report would have

It would also have disclosed "diseased tonsils" and a "functional liver disorder."

### Defendants' Motion to Dismiss.

The defendants have moved to dismiss the bill upon the ground that the action was not brought within two years after the issuance of the policy.

The policy contains an incontestability clause worded as follows: "This policy shall be incontestable after two years from its date of issue except for non-payment of premiums and except as to provisions and conditions relating to Disability and Double Indemnity Benefits."

It is contended that the purpose of the above clause in the policy is to preclude defenses to the policy after two years, unless the defense is nonpayment of premiums, or one of the defenses incident to double indemnity or disability necessary to protect the company from injustice.

■ The defendants rely upon the case of Ness v. Mutual Life Insurance Company of New York, 4 Cir., 70 F.2d 59, and New York Life Insurance Company v. Kaufman, 9 Cir., 78 F.2d 398, and upon the general principle that if an insurance policy contains language that is ambiguous it must be construed most favorably to the insured.

I have carefully examined the Ness Case, above cited, and attention is called to the language of the incontestability clause, which is worded as follows: "Incontestability.—Except for non-payment of premiums and except for the restrictions and provisions applying to the Double Indemnity and Disability Benefits as provided in Sections 1 and 3 respectively, this Policy shall be incontestable after one year from its date of issue unless the Insured dies in such year, in which event it shall be incontestable after two years from its date of issue."

This language specifically limits contestability of double indemnity and disability clauses to the restrictions and provisions mentioned therein.

The incontestability clause in the Kaufman Case is identical with the case at bar, but, in construing it, it is said to be similar to the language of the incontestability clause in the Ness Case. It may be said to be similar, but it is not the same, and the dissimilarity is just what should distinguish it from the Ness Case.

In construing the language of the policy in the Ness Case, the court finds no ambiguity in the language of the incontestability clause, yet the court in construing language said to be similar in the Kaufman Case finds it ambiguous. As I understand the case, the court's opinion is grounded largely upon this supposed ambiguity.

■ I am not prepared to follow the Kaufman Case, and I hold that the complainant in the case at bar is not precluded by the incontestability clause in the policy from obtaining rescission of the double indemnity and disability clauses for fraud or material misrepresentation practiced by the insured at the inception of the contract.

The opinion I have expressed appears to be well supported in the opinions of circuit courts other than the Ninth circuit which, taken in connection with a statute of the state of Maine, confirms my opinion. This statute provides as follows: "Life insurance policies incontestable after two years; exceptions. 1923, c. 164. The policy of life insurance together with the application and the medical examination therefor, a copy or photograph of which application without the medical examination shall be endorsed upon or attached to the policy and made a part thereof, shall constitute the entire contract between the parties and shall be incontestable after it shall have been in force during the life time of the insured for two years from its date, except for non-payment of premiums * * * and at the option of the company provisions relative to benefits in the event of total and permanent disability and provisions which grant additional insurance specifically against death by accident may also be accepted." Revised Statutes of Maine, c. 60, § 147.

In the case of Equitable Life Assurance Society of United States v. Deem, 4 Cir., 91 F.2d 569, the opinion of Judge Chestnut is clarifying. He traces the growth of incontestable clauses and points out the distinction between the Ness Case decided by the same court and the case last above quoted. See, also, Ruhlin v. New York Life Insurance Company, 3 Cir., 93 F.2d 416, filed Sept. 27, 1937; Pyramid Life Insurance Co. v. Selkirk, 5 Cir., 80 F.2d 553. In the case of Stroehman v. Mutual Life Insurance Company of New York, 300 U. S. 435, 57 S.Ct. 607, 609, 81 L.Ed. 732, Mr. Justice McReynolds delivered the opinion

of the court, and said: "No reason appears to doubt the power of the insurer to except from the ordinary incontestability clause all policy provisions relating to disability benefits. * * * But the petitioner maintains that the words used in the policy before us are inadequate definitely to disclose a purpose so to do. And we think the point well taken. * * * Certain life companies undertake to make exceptions to the incontestability clause by words more precise than those now under consideration, and opinions in cases arising upon their policies must be appraised accordingly."

It should be noted that the language in the Stroehman Case is identical with the language in the Ness Case heretofore cited. It is apparent from the above opinion of the Supreme Court that the excepting clause in each policy of insurance must be construed in accordance with its language and the fair meaning expressed, and if the language is not ambiguous, the principle that it will be construed most favorably to the insured is not applicable.

There is nothing ambiguous in the excepting clause found in the policies in suit.

The defendants' motion to dismiss is denied.

### Conclusions of Law.

That a suit in equity may be maintained for a cancellation of the provisions of an insurance policy has been established by a recent decision of the Supreme Court in the case of American Life Insurance Company v. Stewart, 300 U.S. 203, 57 S.Ct. 377, 81 L.Ed. 605, 111 A.L.R. 1268.

The principles of equity are founded on the general or common law and the federal courts apply equitable principles in accordance with their own decisions independent of the decisions of the local state courts. Mutual Life Insurance Company v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 680, 60 L.Ed. 1202; Provident Mutual Life Insurance Company v. Parsons, 4 Cir., 70 F.2d 863.

The fact that the insured failed to mention that he had been examined by Dr. Burrage within five years prior to the date of the application for the insurance policy constitutes a concealment of a material fact which would have led to information which the insurance company was entitled to in determining whether it would take the risk of insuring the applicant. Such concealment is the equivalent of a misrepresentation. The information contained in Dr. Burrage's report disclosed a past history of the insured such as would have deterred the issuing of the policy because it would have disclosed a state of health of the applicant which would have materially increased the risk. There was such a failure by the insured to answer truthfully questions affecting the risk as to make the policies voidable at the option of the insurer. Stipcich v. Metropolitan Life Insurance Company, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895; Ætna Life Insurance Company v. Bolding, 5 Cir., 57 F.2d 626; Keeton v. Jefferson Standard Life Insurance Company, 4 Cir., 5 F.2d 183; New York Life Insurance Company v. Stewart, 5 Cir., 69 F.2d 957; Kaffanges v. New York Life Insurance Co., 1 Cir., 59 F.2d 475; Mutual Life Ins. Co. v. Hilton-Green, supra; New York Life Ins. Co. v. Webber, 1 Cir., 60 F.2d 22.

Actual proof of a design to defraud is not necessary. Such design is usually locked up in the mind of the applicant, and is seldom, if at all, disclosed and must be inferred from the fraudulent answers if they are shown to be within the actual knowledge of the applicant.

In the case of Mutual Life Insurance Co. v. Hilton-Green, supra, Mr. Justice McReynolds says: "Considered in most favorable light possible, the above quoted incorrect statements in the application are material representations; and, nothing else appearing, if known to be untrue by assured when made, invalidate the policy without further proof of actual conscious design to defraud. Moulor v. American Life Insurance Co., 111 U.S. 335, 345, 4 S.Ct. 466, 28 L.Ed. 447; Phoenix Life Insurance Co. v. Raddin, 120 U.S. 183, 7 S.Ct. 500, 30 L.Ed. 644; Ætna Life Insurance Co. v. Moore, 231 U.S. 543, 556, 557, 34 S.Ct. 186, 58 L.Ed. 356." See, also, Ginsburg v. Pacific Mutual Life Insurance Co. of California, 2 Cir., 89 F.2d 158.

As above found, there appears to be no connection between the applicant's present illness, epilepsy, and the undisclosed condition of his health prior to the date of signing the application; but I hold that this is immaterial, because, if there were sufficient grounds for denying the application and withholding the issuance of the policy, the company would not be affected by other diseases contracted or de-

veloped subsequently. New York Life Insurance Co. v. Webber, supra; Jefferson Standard Life Insurance Co. v. Clemmer, 4 Cir., 79 F.2d 724, 733, 193 A.L.R. 171; Ginsburg v. Pacific Mutual Life Insurance Co., supra.

While I do not treat the failure of the applicant to disclose that Dr. McGee had diagnosed his condition at one time as bronchitis and the fact that he had twice had his chest examined at a tuberculosis clinic and an examination of his leg by Dr. Woodcock as entirely inconsequential, to my mind the case turns on the failure to disclose the examination, lasting one and one half hours, by Dr. Burrage, which, if followed up by the insurance company, would have disclosed incipient tuberculosis, arrested.

My conclusion of law with reference to the Dr. Burrage examination cannot be better stated than was expressed by Judge Walker in the case of New York Life Insurance Co. v. McCarthy, 5 Cir., 22 F.2d 241, 244, wherein he says: "The above set out question propounded to the insured called for a statement as to a fact within his knowledge. It was unlike a question as to the applicant having consulted a physician for or suffered from a specified ailment or disease. A question of the kind last referred to may call for the opinion or judgment of the applicant upon a debatable matter, as to which the applicant may be honestly mistaken in making his answer. * * * The question now under consideration called for a statement as to a fact material to the risk to be incurred by granting the application for insurance, as an affirmative answer would enable the insurer to make an investigation and ascertain the truth regarding the cause for the consultation or consultations, and the state of health revealed. It cannot reasonably be doubted that the negative answer to the question was calculated to deprive the insurer of an opportunity it was entitled to be afforded of making an investigation for itself and acquiring information of facts material to the risk involved in granting the application for insurance."

The disability and double indemnity provisions of the contract are separable promises constituting integral parts of a single contract, and can be separately terminated at the option of the insured, but the life insurance provisions cannot be terminated without terminating the whole policy.

Out of the total premium of $63.78, $2.50 is allocated to the double indemnity and $6.25 for the disability benefits. The insurance company has made a tender to the insured of $366.68 of the amount paid on account of these two provisions of the policy. The tender not being accepted, the same was paid into court to await the result of this suit.

It follows from the foregoing opinion that the provisions of the policy relating to disability and double indemnity benefits should be rescinded and declared null and void. A decree to that effect may be presented to the court.