## EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES v. FIRST NAT. BANK OF UNION SPRINGS.

### No. 5606.

Circuit Court of Appeals, Fifth Circuit.

May 21, 1930.

Rehearing Denied June 25, 1930.

R. E. Steiner, Jr., B. P. Crum, and Leon Weil, all of Montgomery, Ala., and L. M. Moseley, of Union Springs, Ala. (B. P. Crum, Leon Weil, and R. E. Steiner, Jr., all of Montgomery, Ala., Alexander & Green, of New York City, and Steiner, Crum & Weil, of Montgomery, Ala., on the brief), for appellant.

Ray Rushton, of Montgomery, Ala., and R. E. L. Cope, of Union Springs, Ala. (Ray Rushton, H. F. Crenshaw, Marion Rushton, and Rushton, Crenshaw & Rushton, all of Montgomery, Ala., and R. E. L. Cope, of Union Springs, Ala., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge.

This was an action by the appellee on two policies of insurance in the sum of $20,000 each issued in September, 1926, by the appellant upon the life of William C. Ellis, who died on October 25, 1926. Each of the policies contained the following provision: "Self-destruction sane or insane, within one year from the date of issue hereof, is a risk not assumed by the Society under this policy. In such an event the Society's liability shall be limited to an amount equal to the premium actually paid." The appellant by pleading alleged that the insured took his own life by shooting himself with a gun. Error was assigned on the court's refusal to instruct the jury to the effect that under the evidence they could not find in favor of appellee for more than the amount of premiums paid to appellant.

The assured died between 11:30 and 12 o'clock in the morning of Monday, October 25, 1926, while in the bathroom on the second floor of his residence in Union Springs, Ala. At the time of his death, and since the death of his father, J. M. Ellis, in 1922, the assured was a stockholder and the president of J. M. Ellis Sons Company, a corporation which conducted a mercantile business in Union Springs, and he managed the financial affairs of that corporation. The evidence as to the cause of the death of the assured was wholly circumstantial. There was no evidence tending to prove that the assured's death was caused by the act of another. When the assured's dead body was found he was lying flat on his back, completely dressed in an ordinary business suit and having on shoes, with a double-barreled hammerless shotgun lying diagonally across his body, the stock being on the left of his lap, the barrels pointing toward his right shoulder, the muzzle being about twelve inches from the right side of his face, there being two shells in the

gun, the one in the left barrel appearing to have just been exploded, and the one in the right barrel being unexploded. Much of the right side of the head was gone, a witness stating: "I would judge that the load of the shot gun went from the side of his face up—angling from the right side of his face, about parallel with the mouth, on to the center of the head." What was principally relied on to support the contention that the death was by suicide was evidence as to the physical facts disclosed at the scene of the death and evidence as to the financial condition of the business of which the assured had had charge. Evidence showed that at the time of the assured's death the above-mentioned corporation was in a financially embarrassed condition, that that corporation was adjudged bankrupt soon after the assured's death, and that in the winding up of its affairs its general creditors received only between 16 and 17 per cent. of the amounts of debts owing to them. There was evidence to the following effect: On the Friday preceding the day of his death the assured made an engagement with a man living in the country to go dove hunting on the following Monday, saying that he would. be out around 12 o'clock. On Sunday he promised a person living in the country to get a new key for the Ford car belonging to the latter. The assured complied with that promise, the new key being found on his person after his death. During Monday morning—as stated by the witness A. M. Bradbury, "about 9:30 or 10 o'clock"—the assured went to the grocery store of Bradbury, who sometimes bought and sold second hand guns, and asked for a shotgun his brother, Joe Ellis, had left there, saying he wanted the gun to shoot doves. Bradbury, after stating that the gun had been sold, told assured he had another gun to which he was welcome, and showed him that gun. Assured said he would send for that gun when he got ready to go. He sent a boy for it. That was the gun which was found lying on assured's dead body. Bradbury got that gun from one Ely. It was not used by Bradbury after he got it. Upon Bradbury being asked on cross-examination whether the gun was loaded "in your place of business," he answered: "No, sir, I don't think it was; not that I know of." There was no testimony to the effect that the gun was unloaded when the assured got it from Bradbury, or that the assured loaded the gun, or knew that it was loaded, or that he obtained any shells for use in it. Ely, the former owner of the gun, and his father testified to the effect that that gun was tricky, that sometimes both barrels would shoot when only one trigger was pulled, that it would shoot when no trigger was pulled, and that without pulling a trigger it would snap, with the result that the plunger would fire the gun if it was loaded. The testimony of several witnesses was to the effect that they came in contact with the assured during the morning of the day of his death, and that he appeared to be normal and cheerful, nothing in his manner or appearance indicating that he was excited, depressed, or gloomy. At the time of the assured's death two pistols were kept in the store of the above-mentioned corporation, one in the assured's desk in his office, and the other in one of the drawers in the cash register, to which the assured had access. There was no evidence that the assured had done anything criminal or disgraceful. When the fatal shot was fired, the assured's wife was sitting in a room on the first floor of their residence. She did not see or hear the assured when he came in and went upstairs. Her attention was first attracted by hearing a noise upstairs, "like something had fallen on the floor."

■■ When the question is whether a death was or was not suicidal, it is one for the jury if the evidence is such that reasonable persons, in an impartial and fair exercise of their judgment, may honestly reach different conclusions. The court cannot properly give an instruction involving or requiring a finding that the deceased voluntarily killed himself if there is evidence furnishing any substantial basis for a belief that the death was accidental or was caused by the act of another, or for an honest doubt as to it having been voluntarily self caused. Mutual Life Ins. Co. of New York v. Savage (C. C. A.) 31 F. (2d) 35; Ætna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243; Mutual Life Ins. Co. of New York v. Gregg (C. C. A.) 32 F.(2d) 567.

■ It is apparent that the evidence which indicated suicide would have been more convincing if it had disclosed things which were not disclosed. A finding that the assured intended to kill himself would have been more clearly called for if uncontroverted evidence, instead of indicating that he did not seem to be seriously disturbed by financial troubles, had shown that thereby he had been made apparently despondent or hopeless. The evidence that the insured intentionally killed himself would have been stronger if it had shown that he knew or was informed that the gun was loaded when he got it, or that he loaded it after he got it. A doubt as to the assured having a suicidal purpose not un-

reasonably might be based on the absence of evidence that he knew or had reason to believe that the gun was loaded when he got it and took it to his residence. The evidence as to the gun being tricky and liable to be discharged without a trigger being pulled furnished a basis, which would not have existed if there had been no such evidence, for a belief not merely fanciful that the fatal discharge may have been accidental. There was some basis for an inference that if the assured had intended to kill himself he would have used a pistol which he had readily at hand, instead of borrowing a shotgun without, so far as any evidence indicated, inquiring whether it was or was not loaded, and without getting loaded shells for use in it. As above indicated, there was evidence tending to prove that the assured fell to the floor after he was shot. No evidence showed the location after his death of either of his hands with reference to the gun. There was nothing in the evidence to indicate what part of the gun was held by the assured at the time the discharge occurred. The absence of such evidence, in connection with the evidence as to the gun being tricky, not unreasonably might give rise to a doubt as to the discharge of the gun having been caused voluntarily by the assured. We do not think that it properly can be said of the evidence that none of it had a substantial tendency to show that the death might have occurred otherwise than by the voluntary act of the assured. It follows that the above-mentioned ruling was not erroneous.

The judgment is affirmed.