## TRAVELERS' INS. CO. v. WILKES.
### No. 7639.

Circuit Court of Appeals, Fifth Circuit.
April 18, 1935.

Francis M. Holt, Sam R. Marks, and Harry T. Gray, all of Jacksonville, Fla., for appellant.

Frank F. L'Engle, of Jacksonville, Fla., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The policy insured Beverly Corbin Wilkes "against loss resulting from bodily injuries effected directly and independently of all other causes through accidental means, (suicide, sane or insane, not covered), as specified in the following schedule. * * * For loss of life the principal sum" $10,000; his wife being named as beneficiary. The declaration was framed in two counts alleging insured's death through accidental means, the first count averring it to have been due to a bullet from a pistol "accidentally discharged by the insured or by some person unknown to the plaintiff." The second count alleged the pistol to have been fired "by a person or persons unknown to the plaintiff without the aid or design of the insured and without fault or provocation on his part." The allegations of the first count of an accidental shot exclude suicide. The allegations of the second count show the means of death to have been accidental so far as the insured was concerned and not suicidal, and set forth a cause of action. Mutual Life Ins. Co. of New York v. Sargent (C. C. A.) 51 F.(2d) 4. The demurrers to each count were properly overruled.

The pleas specifically denied the allegations quoted from each count, and denied generally that the death was effected through accidental means. There was also an affirmative plea to each count that the death was due to suicide. The verdict was for the plaintiff, but did not specify on which count it was rendered. An instructed verdict was moved by the defendant on the whole record, and as to each count separately, and exceptions were reserved also touching charges given and refused with reference to the burden of proof as to suicide.

The evidence without important conflicts showed facts outlined as follows: At about 8 o'clock on Thursday morning, October 29, 1931, the insured was found dead, stretched at full length diagonally upon a bed in a tourist camp cabin, both hands lying palm down on his stomach with fingers extended, the left hand about the waistline and the right lower down. His head was upon the pillow near the center of the

bed, his feet near the right-hand edge. He was in his underclothes, barefooted, with the bedclothes tucked around him from the waist down, feet together, and toes pointing up. In the crook of the left elbow, with the barrel up, was a United States Army Colt .45 automatic pistol, butt well down between the arm and body, hammer cocked and pressed into insured's side so as to leave a mark there. Two empty pistol cartridges were upon the floor near the bed. The insured's head had been penetrated by a bullet entering just above the canal of the right ear, passing through the brain and out a little higher over the left ear and more to the rear. Brains, bone, and blood were upon the pillow to the left of the head. Embedded in the cabin wall to the left of the bed a few inches higher than the pillow level was a bullet, which on test showed blood upon it and which fitted the pistol and bore left-handed rifling marks characteristic of the Colt pistol. There were no burns or powder marks around the entrance wound externally, but there were powder marks on the underside of flaps of skin there which were blown outwards. The sutures of the skull were loosened. Physicians who were experts touching such wounds agreed that the weapon must have been against or very close to the head, and that the expansion of the gases from the pistol barrel had taken place within the skull, bursting it, and that death was instantaneous, so that no voluntary movement was possible after the shot; and that in the case of a human, differing in that respect from some lower animals, there would be instant collapse and relaxation of all muscles. The cabin walls showed the marks of another bullet which had passed above insured's head and struck behind the head of the bed (it having no solid headboard) a little above and to the left of the insured's head. It had penetrated the corner of the framing, struck the weatherboarding further to the left and a little higher, whence, deflected, it had passed through the other wall at the left side of the bed near where the other bullet was embedded. The doors of the cabin were found fastened on the inside.

There were no signs of any struggle. Coat and pants were thrown on a chair. A quarter and a copper were in the pants pocket, but no money in a billfold. To the right of the bed near its head, and not more than three feet from insured's body, was a window opening on a porch. The window was found with shade drawn, sash down but not fastened, and outside the sash a collapsible windowscreen which could be taken out and put in from the porch without difficulty. A corner washstand stood near the window at the head of the bed. The body was discovered by removing the windowscreen, opening the sash, pushing up the shade, and stepping into the room.

The cabin was one of a group of four or five standing some distance apart in an inclosure surrounded by a fence on three sides and on the fourth by a navigable creek some 40 or 50 feet wide. Mrs. Jork, the woman who owned them, lived in one near the entrance and furnished meals and drinks to persons who rented them by the night. The place was a half-mile off the highway from Jacksonville, Fla., to Atlantic Beach in a sparsely settled neighborhood.

The insured was superintendent of a telegraph company's business in Jacksonville, was 38 years old, married, and had a 3 year old son. He was somewhat in debt, had had a salary cut, and his finances were not good but were not desperate. At the beginning of the year he had been sued by his wife for a divorce, she alleging intoxication and cruel treatment, but the suit had been dismissed on his promise not to drink more, which promise she testified he had kept and they had since lived more happily than ever. His mother died early in October in Virginia, and the wife and child had remained away on a visit after the funeral, but were expected home soon. On the Saturday before his death insured was drinking, and spent Saturday night and Sunday at his club. He was then seen in possession of considerable money. He gambled at times, and made and lost money that way. On Monday he went to his work and was in his usual good spirits, but did not appear Tuesday or Wednesday. He was seen Tuesday afternoon in Jacksonville. It is testified, nevertheless, that about 11 on Tuesday morning he came to Mrs. Jork's in a car furnished him by the telegraph company and rented this cabin, saying that he expected a friend to join him for dinner. No one came. He had her send a meal in the evening, but refused meals the next day. He stayed in the cabin Tuesday night, Wednesday, and Wednesday night, sending in his automobile during Wednesday a negro who stayed on the premises to get first two pints of whisky and then some cigarettes. Two empty pint bottles and an empty quart bottle which had contained liquor were found the next

day in the room, with numerous cigarette stumps. He gave Mrs. Jork a $10 bill to pay for the cabin, receiving $7 in change. She did not know what other money he had. No one to her knowledge came to his cabin nor did he leave it. A couple occupied another cabin Wednesday evening, but left about 11 o'clock that night. Around 1 o'clock her dog waked her, but only a cat was found in her chicken-yard. At about 4 o'clock she was awakened by a gunshot, but thought nothing of it. At breakfast time Thursday she sent the negro to ascertain if insured wished breakfast. Failure to get any answer led to opening the window, to the discovery of the body and the summoning of officers. The pistol was sufficiently identified as belonging to the insured, who was a World War veteran. A few days before, in discussing a case of disappearance, he had said in substance that the only way to disappear was to blow one's brains out.

The pistol was in evidence shown to be in good condition. It ejected the shell and reloaded and recocked itself automatically on firing, but could not be fired at all unless the safety on the back of the butt below the hammer were compressed at the same time that the trigger was pulled, nor could it be fired a second time unless the trigger were first fully released and pressed again. The cabin porch adjoined the bank of the creek and was on the side of the cabin opposite to the dwelling of Mrs. Jork. The negro lived within a few hundred yards, and other white and colored families dwelt in the neighborhood.

The motion to instruct a verdict against the first count, which alleged an unintended firing of the pistol, ought to have been sustained. The safety devices of the pistol do not permit it to be fired except when, grasped by the butt, its well-guarded trigger is pulled. The muzzle was against the head of insured, or too near it even to burn the hair, and he was prone on the bed when the fatal shot was made. The range of the bullet slightly up and somewhat toward the foot of the bed accords with the diagonal position of the body, and it could not have been fired at much distance from the head because the head of the bed itself and the wall immediately behind would prevent it. Whether the pistol was held in the hand of the insured or of another, there is no room to think there was an accidental discharge. The two shots, whether the other one followed immediately or was fired previously,

cannot be accounted for by any reasonable theory of two unintended discharges. Under the evidence in the record, no reasonable conclusion can be reached other than that the insured was intentionally shot either by his own or by some other person's hand. The so-called presumption against suicide does not help here. It is not a rigid, arbitrary rule of law but is only a special recognition of that common knowledge and experience which forms the background of every trial and the test of every question of probability or credibility. It rests on the common knowledge, which may be noticed without proof by a judge and jury, that sane persons do not ordinarily kill themselves. That knowledge suffices to tip the scale in favor of accident when it appears that one has died from his own act, but there is nothing to show whether the act was or was not intentional, as well as when a death is proved but the manner of it cannot be ascertained. Where the circumstances show that death resulted from an intentional act, an accident can no longer be assumed. Under the circumstances here disclosed, a finding that the insured was unintentionally shot, either by himself or any other person, cannot reasonably be made.

■ On the second count we gravely doubt whether under the present evidence it can be found that some one else killed him, for no one is shown to have been present. It is possible that insured had money with him, that it became known through the negro or otherwise that he was lying drunk in the cabin, and that the cabin was approached in the night from the creek and entered from the porch through the window and insured was killed with his own pistol while asleep and his paper money stolen. His body could have been "laid out" as it was and the pistol tucked under the left arm and the window closed on departure with no discoverable tracks left. But it is a possibility not definitely supported by evidence. On the other hand, the circumstances are consistent with suicide, except the difficulty of accounting for the two shots and for the position of the body and of the pistol afterwards. Possibly an experimental shot may have been first fired by insured, or, though the doctors thought otherwise, a convulsive second pressure of the trigger might have occurred as the pistol recoiled from the fatal shot, causing the wild shot which passed above the head. The position of the feet and of the lower body covered by the bedclothes makes no

great difficulty in the suicide theory, but the position of the hands and of the pistol does. A series of very unlikely reactions must be assumed to get the pistol where it was instead of to the right of the head and body or on the floor where the recoil which is testified to be powerful would naturally have thrown it, and to get the right hand peacefully laid across the abdomen. But again some one other than a murderer may have thus arranged the body. Another trial may produce further evidence tending to show whether some one other than the insured fired the pistol or arranged the body. We express no final opinion upon the possibility of recovery on the second count. The judge in overruling the motions for instructed verdicts in the absence of the jury expressed views quite similar to those we have stated. Nevertheless, he overruled all the motions and sent the entire case to the jury. The jury's verdict, being general, fits one count as well as the other. It cannot be known that they found for the plaintiff on the second count. An error made affecting only the first count is sufficient to require reversal. Baltimore & Ohio R. Co. v. Reeves (C. C. A.) 10 F.(2d) 329; Patton v. Wells (C. C. A.) 121 F. 337.

 We also think the charge touching the burden of proof was confusing. The court correctly told the jury that the burden was upon the plaintiff to show that the death was directly and independently of all other causes the result of accidental means, and that the burden of establishing an accidental death was upon her and remained with her throughout the case. At the same time, more than once and against requested charges to the contrary and over exceptions taken, the jury were told that the defense of suicide was an affirmative defense and the burden of establishing it by a preponderance of the evidence was upon the defendant. The latter charge would be correct in a suit upon the usual life policy containing an exception of death by suicide, for then the plaintiff need prove only death; the insurer having to plead and prove the exception. But this policy promises payment not for death, but for death by accident. Suicide, at least when sane, is not accidental death. A plaintiff under this policy has the burden of proving an accidental death, thereby negativing suicide. The denial that the death was accidental was a sufficient plea. The additional plea that it was suicide, though more specific, really added no defensive merit. It was not the setting up of an exception from the policy but a denial that the death was of the sort insured against. The burden of proof remained on the plaintiff. New York Life Ins. Co. v. Anderson (C. C. A.) 66 F.(2d) 705; New Amsterdam Casualty Co. v. Breschini (C. C. A.) 64 F.(2d) 887; Mutual Life Ins. Co. v. Gregg (C. C. A.) 32 F.(2d) 567; United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; Protective Life Ins. Co. v. Swink, 222 Ala. 496, 132 So. 728. It is only after the evidence is in that the presumption against suicide may come into play to help the plaintiff to bear the burden. It does not regulate nor change the burden of proof, but it is an evidentiary presumption which may aid a lack of evidence but cannot prevail against the evidence. Where the evidence makes it proper, a jury may be instructed how to use this presumption, but it ought not to be confused with the burden of proof under the pleadings. Appellate courts, in discussing the sufficiency of evidence to show accidental death, have sometimes spoken of the presumption as shifting the burden of proof, but such language is not accurate. The presumption has not much place in this case because we have held that, if the insured killed himself, the circumstances show that it could not have been accidental. On the question whether some one else willfully killed him, the presumption against felony would seem to offset that against suicide. The jury ought not to have been charged in broad terms that the burden of proof on either count was upon the insurer to show that a suicide had occurred.

 The extent to which experiments made out of court to ascertain the amount of recoil of a Colt .45 and the probable result of it may be proven to the jury rests in the sound discretion of the judge. We do not find that discretion abused. Other exceptions to rulings on evidence show no harmful error.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.