**MAYFIELD et al. v. ÆTNA LIFE INS. CO.***

**No. 8885.**

Circuit Court of Appeals, Fifth Circuit.

Dec. 3, 1938.

Hal Browne, of San Antonio, Tex., for appellants.

*Rehearing denied Jan. 16, 1939.

200

J. D. Wheeler, of San Antonio, Tex., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The children of Gideon Mayfield, as beneficiaries, sued Aetna Life Insurance Company for $7500 upon a policy of insurance on Mayfield's life issued July 22, 1935. It promised to pay $2500 at death at any time, but $5000 if death occurred within ten years, and an additional $2500 if the death resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means; but if the insured should commit suicide within two years, while sane or insane, the Company to be liable only for an amount equal to the premiums paid. The defense was a denial of accidental death, and an allegation that the death was suicide.

On the trial the evidence showed that on February 21, 1937, Mayfield was spending the night at his brother-in-law's home, and having just left him and other members of the family who went to bed, talked with his mother, kissed her, and went upstairs to the room where he was to sleep, in which a light was burning. His mother extinguished the light downstairs, but soon heard Mayfield coming down the stairs and went back to meet him. He asked if his brother-in-law was asleep, and being told he was, again started back upstairs. In a few seconds a stumbling or falling was heard. The mother called the son-in-law, thinking her son had fainted and fallen. She heard no shot. Her daughter, however, who was awake, heard the stumbling and a shot, she testifying that the stumbling began first, then the shot, and then the stumbling or falling continued. Mayfield was found at the top of the stairs, his feet upon them, his head and shoulders and arms extending across the threshold of his bedroom, the door of which was partly open. He was face downwards, and shot through the head, the bullet entering behind and below the right ear at the edge of the hair and passing out just above the left ear. The wound of entry was without burns or the tearing of flesh usual when the pistol barrel is pressed against the flesh. His pistol, a Colt automatic, was lying near but not in his right hand, and had been discharged. This occurred about ten-thirty at night. The next day the path of the bullet was accurately traced through the wooden door and into the wall of the room beyond, and it was demonstrated that Mayfield must have been on the second or third step from the top and not erect but leaning or falling forward toward the door. The course of the bullet through the door showed the door to have been slightly open but not enough for one to readily pass in. There was a wall on the side of the stairway to the right of one going up. Without giving further details, it can hardly be doubted that Mayfield was shot by his own pistol in his own right hand. The sole question is, Was it done intentionally or by accident?

Additional circumstances illustrating intent are: Mayfield was in good physical health, no financial or domestic trouble is shown, nor any despondency or previous suggestion that he might kill himself. On the night of his death there was nothing peculiar or irrational in his conversation or conduct except on one point, and that was that when he arrived he told his brother-in-law that there were Mexicans on his own plantation who were seeking to harm him and he had come to his brother-in-law for protection. This fear was not communicated to his mother or other members of the family. He had expressed it two days previously to the brother-in-law, and to the sheriff of the county who was related, and to other persons, in such wise and with so little apparent foundation as to make it fairly certain that Mayfield was laboring under a delusion of persecution. Experts testify that such a delusion indicates mental unsoundness but does not demonstrate any particular kind, and that one so affected usually seeks either to destroy those he thinks are threatening him or else to destroy himself as a means of escape. The pistol was shown to have been in good condition, and that it could be fired only by simultaneously pressing the safety device on the handle, as when it is held in the hand, and by pulling the trigger strongly.

■ The Insurance Company moved for an instructed verdict in its favor. The judge reserved decision on the motion and submitted the case to the jury, who returned a verdict: "We, the jury, find for the plaintiffs." The plaintiffs then moved for judgment on the verdict, and the defendant for a judgment on the reserved motion notwithstanding the verdict, under a Texas practice applicable in the federal

court. Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636. The judge granted the latter motion.

■■■■ We are persuaded this ruling was error. To completely defeat the policy suicide, while sane or insane, had to be shown by a preponderance of the evidence, all the evidence being weighed without reference to which party presented it. Fidelity & Casualty Co. v. Driver, 5 Cir., 79 F.2d 713. This weighing is the function of the jury, who not only determine what facts are true but also what inferences may reasonably be drawn from them. The evidentiary facts are not in dispute here, but only the inferences reasonably to be drawn. The court could rightly take the case from the jury only if the inference of intentional self-slaughter is so clear as to be the only reasonable one. We do not think it is. We may assume that an incipient insanity is proven, and that the force of the so-called presumption against suicide is thereby weakened. But that same fact permits explanations of conduct and inferences of intention somewhat different from those that would apply to normal persons. The conduct of a person laboring under a delusion, though he be otherwise sane, must be viewed with reference to the delusion. If Mayfield at the time believed he saw Mexicans following him up the stairs, drew his pistol to shoot them, and, perhaps looking over his left shoulder, as he reached his door stumbled and struck his elbow in falling against the wall or the steps so as to turn the pistol towards himself and to cause him to clutch it tightly enough to fire it, a possible, and we think a reasonable, explanation is afforded. Whether it is the most reasonable one or the true one a jury must say. A falling man, and especially a terrified one, may get himself into unusual positions. The physical difficulty of firing a pistol which has such safety devices towards one's own head is about the same if it be done with intent to kill one's self as if done accidentally. The difficulty of explaining why the insured had his pistol out at all if not to kill himself as he did do, which is so often present when a self-inflicted wound occurs with no one else present, is not so great here, because this man may have supposed himself surrounded by attacking enemies. A stumble up the stairs is also thus explainable. On the theory of suicide there are also unusual difficulties in the time, place and circumstances chosen by Mayfield, and the absence of any cause or previous purpose to do so. Since some of the circumstances point in a different direction from others, and there is the peculiar element of insanity, and the main question is one of a deceased person's intention, we think a jury issue was presented.

■■■■ The appellants insist that we should direct that judgment be entered on the verdict. We cannot do so because the verdict fixes no amount of recovery. Under the pleadings one of three verdicts was possible. If the jury should find that the preponderance of the evidence showed suicide, the verdict would be for the defendant. If the preponderance showed accident the verdict would be for the plaintiffs to recover $7500. If, however, the jury should find the evidence so balanced, or so meager, that they could not say what the truth might be, so that the Insurance Company had not borne the burden to prove suicide and the plaintiffs had not borne their burden to show an accidental death, then the verdict should be for $5000 in favor of the plaintiffs. This is so because the plaintiffs have clearly proven a death within ten years which entitles them to $5000, but would have failed as to the additional $2500 which they could get only on proving by a preponderance of evidence that the death was accidental. So the defendant by failing to prove by a preponderance of evidence that the death was suicide would have failed to defeat all recovery. Evidence in equipoise does not establish anything in a court of law. If the parties have left the case in such darkness as to leave this matter a mystery, the fact that in reality it must have been suicide or accident does not save them from what is in effect the Scottish verdict "Not proven". The verdict here is for the plaintiffs, but for neither of the possible amounts. It does not cover the issues and will not support a judgment.

■■■■ We have searched the record to see what explanation there may be for the form of the verdict. The bill of exceptions contains nothing save the evidence. That a motion for verdict was made by the Insurance Company and judgment reserved appears in the judgment finally signed by the judge, and being thus certified by him we accept that fact. There is in the transcript what seems to be the oral charge of the court to the jury, but it is not au-

thenticated by anyone. It is no part of the record before us. There is a written opinion also. It shows that the judge thought the death must be either suicide or accident, which is good logic; and that a verdict for $7500 or nothing must be had, which, as we have said, we think to be bad law.

The judgment is reversed and the cause remanded for a new trial.