**UNION CENT. LIFE INS. CO. v. COOPER.**

**No. 9283.**

Circuit Court of Appeals, Fifth Circuit.

Nov. 7, 1940.

Marion Rushton, of Montgomery, Ala., for appellant.

Thos. B. Hill, Jr., and Wm. Inge Hill, both of Montgomery, Ala., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Union Central Life Insurance Company insured Milton L. Cooper under three policies of life insurance carrying identical double indemnity riders. The face amounts of the policies totaled $10,000. On November 18, 1937, Cooper died as the result of gunshot wounds. The insurance company paid the face amount of the policies but denied liability on the double indemnity riders. Annie M. Cooper, wife of the insured and named beneficiary in the three policies, brought suit to recover the double indemnity benefits. The cause was tried to a jury which returned a verdict for the plaintiff. Judgment was entered for the full amount of the riders, plus interest and costs, and the insurance company appealed.

The record shows that Milton L. Cooper was a man 42 years of age, about six feet tall, weighing about 180 pounds. He had been married to Annie M. Cooper for twenty years and was the father of two children. He was president and general manager and "had entire charge of the

operation" of Home Bond and Mortgage Company, a corporation doing a loan, insurance, and second mortgage business in Montgomery, Alabama. For his services with this company he received a salary of $250 per month at the time of his death. He and his wife were joint owners and operators of another corporation, the Home Syndicate, which they ran from the offices used by Home Bond and Mortgage Company. Cooper also operated numerous penny peanut vending machines as a side line.

Cooper lived with his wife at their home in Montgomery and also owned a camp on Lake Jordan near Montgomery. He and Mrs. Cooper worked in the same offices and usually went home together to lunch about 2:30 in the afternoon. On occasion, depending upon business, they went to lunch separately; both had automobiles. On the morning of November 18, 1937, both Cooper and his wife were very busy at the office. Mr. Cooper's morning was largely consumed by business conferences which he conducted in his normal, cheerful manner. In at least one conference he mentioned a hunting and fishing trip he had planned for the next day and was "very jolly over the prospect". Sometime after 1 o'clock he came from his private office into the outer office and told his wife that he was going home "to check up on his equipment", getting ready for the trip he had planned to take the next day and about which he had told her the night before. Mrs. Cooper was not ready to go at that time and continued to work at her desk. A little while later the negro maid at the Cooper home telephoned Mrs. Cooper and told her that Mr. Cooper was sick and had fallen in the bathroom. Mrs. Cooper hurried home and found that her husband had been shot. Before Mrs. Cooper reached home a police officer arrived there. He went into the bathroom and found Mr. Cooper lying diagonally across the floor on his back with his face up and with his body between the bath tub and the door. His automatic shotgun had fallen behind the bathroom door. The officer asked Cooper how it had happened. Cooper replied, "Get a doctor", and as blood gushed from his mouth the officer told him not to try to talk, "Don't say any more." He was immediately rushed to the hospital and the nurse there said his last words were to the effect, "I am sorry this had to happen, for I had planned to go hunting and fishing tomorrow." The best recollection of the officer was that Mr. Cooper's topcoat, coat, and vest were in the bedroom; Mrs. Cooper was positive that his vest was shot through. The officer made no search of the bathroom and saw no ramrod, cleaning materials, or anything of that kind, but it was without dispute that Cooper kept the lubricating oil for his gun in the bathroom cabinet. The officer found one freshly exploded shell in the breech of the gun and two loaded buckshot shells in the magazine.

Dr. Kirkpatrick, the coroner, testified that the shot went in and out of Cooper's body at about the same height. Dr. George Blue, a physician and surgeon, testified that he attended Cooper at the hospital, and that the load of shot which caused his death entered his chest between the fifth and sixth ribs and ranged upward "most of the buckshot coming out through the shoulder blade behind the second and third ribs"; that the shot took the course shot would take if fired from a gun over which a man was leaning to push down the barrel. A certified copy of the death certificate from the Alabama Bureau of Vital Statistics was introduced in evidence. The certificate stated that Cooper received his injury from "gunshot", its cause "accident". The other alternatives on the certificate, "suicide" and "homicide", were stricken and a question mark was placed by the word "accident".

On the day before Cooper's death he had made plans to go with two of his friends on a fishing trip to Yellow River, Florida. They had planned to leave Montgomery at 2 a. m. on November 19th. Cooper had expressed an intention to carry his Browning automatic shotgun for the purpose of shooting duck which were plentiful on Yellow River at that season. Mrs. Cooper testified that she had never spent a more pleasant evening with Mr. Cooper than the evening before his death and that he appeared jovial and happy. Just two days before his death he had written and ordered new supplies for his penny peanut vending machines and had made request for "more order blanks". He had been talking with an automobile dealer about buying a new car and the afternoon before his death he drove into the country with the dealer to look at a fish pond and was in good spirits at the time. After his death an audit of Home Bond and Mortgage Company's books revealed

a cash shortage of $8,233.73 and a total shortage of $17,501.12.

Some years before his death Cooper had sustained an injury of the right hand which severed the nerve and resulted in a permanent total loss of sensation and permanent partial paralysis of the middle and index fingers of that hand. He was able, however, to write with his right hand. It was further shown that the index finger of the right hand is the one normally used by a person to manipulate the slide lever to unload a Browning automatic shotgun such as the one owned by Cooper. Various witnesses testified that such guns can be unloaded by placing the stock on the floor and pushing down the barrel, but that unloading of a gun in this manner is a most dangerous operation. In unloading a gun in this manner the entire barrel is recoiled, and if there is a loaded shell in the barrel its base, which contains the cap, will be pressed against that portion of the gun mechanism from which the firing pin protrudes. If the firing pin or slot into which it is supposed to recede at the rear of the breech block is clogged or fouled, or chipped or worn, a shell being ejected will press against the firing pin and explode. There is evidence that Cooper did not remove shells from his gun in the accepted manner by manipulating the lever in the usual way, and that it was his habit to press the weight of his body against the barrel and thus "shuck out" the shells by pushing down on the barrel. The gun which killed Cooper was sold shortly after the accident but was recovered and was at the trial and in good working order.

The above is substantially all the material evidence in the record. The only issue was whether or not Cooper met his death by accident or as the result of intentionally self-inflicted wounds.

The appellant contends that the evidence does not support the verdict and that the court erred in denying its motion for a directed verdict.

In suits on double indemnity riders of life insurance policies the burden is upon the plaintiff to establish by a preponderance of the evidence that death was accidental. Travelers' Ins. Co. v. Wilkes, 5 Cir., 76 F.2d 701; Scales v. Prudential Ins. Co., 5 Cir., 109 F.2d 119; Love v. New York Life Ins. Co., 5 Cir., 64 F.2d 829; Mayfield v. Ætna Life Ins. Co., 5 Cir., 100 F.2d 199; New York Life Ins. Co. v. Bradshaw, 5 Cir., 2 F.2d 457; Frankel v. New York Life Ins. Co., 10 Cir., 51 F.2d 933.

In cases where the evidence indicates suicide and supports no reasonable theory of accident a directed verdict for the defendant should be given. Scales v. Prudential Ins. Co., 5 Cir., 109 F.2d 119, and cases cited.

Here we have a case which is different from the cases just adverted to. The evidence presents a reasonable theory of accident and clearly made an issue for the jury. The court properly refused to direct a verdict for the defendant. Equitable Life Assur. Soc. v. First National Bank, 5 Cir., 40 F.2d 817; Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., 79 F.2d 724, 729, 103 A.L.R. 171; New York Life Ins. Co. v. Sparkman, 5 Cir., 101 F.2d 484; Supreme Lodge Knights of Pythias v. Beck, 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed. 741.

We find no reversible error in the court's instructions to the jury. Cf. Travelers' Ins. Co. v. Wilkes, 5 Cir., 76 F.2d 701; Fidelity & Casualty Co. v. Driver, 5 Cir., 79 F.2d 713; Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., 79 F.2d 724. Also see Rules of Civil Procedure for District Courts of the United States, Rule 51, 28 U.S.C.A. following section 723c.

The judgment is affirmed.