AETNA LIFE INSURANCE COMPANY,
HARTFORD, CONNECTICUT v. NICOL.

[No. 17,767. Filed June 3, 1949. Rehearing denied October 5, 1949. Transfer denied November 8, 1949.]

*Fraser & Isham,* of Fowler; and *Stuart, Devol, Branigan, Ball, & Ricks,* of Lafayette, for appellant.

*Charles B. Kemmer; Vaughan & Vaughan,* all of Lafayette; and *Edward Dumas* (of counsel), of Fowler, for appellee.

BOWEN, C. J.—The appellee sued the appellant, Aetna Life Insurance Company, to recover as the named beneficiary on a double indemnity clause of a life insurance policy on the life of appellee's husband, Admiral Dewey Nicol. The face amount of the policy was $20,000 which the company paid to the appellee, but it denied liability on the $20,000 double indemnity clause.

The issues were formed by appellee's complaint and appellant's answer, and the cause was tried by a jury and a verdict was returned for the appellee in the sum of $23,800 upon which judgment was rendered accordingly.

The appellant filed a motion for a new trial, the overruling of which motion was the sole assignment of error in this court. The specifications in the motion for a new trial are that the verdict of the jury is not sustained by sufficient evidence and is contrary to law;

and that the court erred in overruling defendant's written motion for a directed verdict filed at the close of all of the evidence, and that the court erred in refusing to give to the jury Instruction No. 1 requested by the defendant, which was an instruction to direct a verdict for the appellant.

The appellee contends that appellant has presented no question in this appeal by reason of appellant's alleged failure to comply with rule 2-17. While we do not approve the form of the brief in its entirety, we are of the opinion that a good faith effort has been made by appellant's counsel to prepare the brief in conformity with the rules and requirements of this court so that under the rules and with full consideration thereof, this court is able to understand the questions presented in this appeal and that the brief of appellant is, therefore, sufficient for a determination of this appeal on its merits.

The various specifications of error and propositions asserted by the appellant question the sufficiency of the evidence to support the verdict on the grounds that there is no evidence showing that the assured's death resulted from accidental means, and that such death was not the result of suicide or any attempt thereat while the assured was sane or insane.

The double indemnity provisions of the insurance policy in question were the usual type of such provisions found in most policies of life insurance. It provided that if death results directly and independently of all other causes from bodily injuries effected solely through external violent and accidental means . . . and if such injuries are evidenced by a physical contusion or wound on the exterior of the body. . . . The company will pay $20,000 in addition to the insurance payable under the policy for natural death. The provision

does not apply to the death of the insured resulting from suicide or any attempt thereat while sane or insane.

The appellant admits that the record contains evidence supporting all conditions precedent to recovery, but denies that there is evidence sufficient to support the verdict that death was the result of accident and not the result of suicide.

In determining the questions presented in the assignment of errors we must consider all such evidence as is most favorable to appellee in determining whether there was sufficient evidence to support the verdict, and the evidence necessary to support a verdict may be based upon circumstantial evidence. *Orey* v. *Mutual Life Ins. Co.* (1939), 215 Ind. 305, 19 N. E. 2d 547; *Sovereign Camp Woodmen* v. *Haller* (1900), 24 Ind. App. 108, 56 N. E. 255; *Prudential Ins. Co.* v. *Dolan* (1910), 46 Ind. App. 40, 91 N. E. 970.

In the present case there was no direct evidence concerning the immediate circumstances of the fatal shooting of the insured. Therefore, in determining the issue presented by this appeal, we must ascertain whether there was any circumstantial evidence which the jury had a right to consider to support the verdict based upon the accidental death of the insured.

The record discloses evidence from which the jury could have properly found that Dewey Nicol, the insured, was 46 years of age and resided in West Lafayette, Indiana. He was a plastering contractor, married, and the father of three living children, the youngest being nine years of age. On the morning of March 20, 1944, Nicol left his home with no luggage except his briefcase. He told his wife he was going to check on some pending jobs. He went to Marion, Indiana, and returned by the next morning. He did not go home that night

and he was seen in Lafayette Tuesday and Wednesday. Wednesday evening about 6:00 p.m. he arrived at the house of one Grover Miller. Miller was a bachelor farmer living on a 95-acre farm near Klondike, Indiana, about six miles from Nicol's house and near Nicol's golf club. Miller's farm was a fine place to hunt and Nicol had been there hunting during the hunting season. Nicol stayed at the Miller house Wednesday and the next two nights sleeping on a cot in Miller's bedroom. During this time he never left the house except to go with Miller to the town of Montmorenci for supplies Friday night. He spent his entire time sitting, talking to Miller, reading mystery stories, and looking at papers in his briefcase. The entrance to the Miller house used by Miller was on the south end and into the kitchen. The living room in which the heating stove was located was to the east of the kitchen, and the bedroom was north of the living room. In the bedroom Miller kept a loaded shotgun and a loaded pump gun type Winchester rifle. Sometime during Nicol's stay at Miller's house these guns were brought out and handled by Nicol, who was told they were loaded. Nicol was an expert marksman, thoroughly familiar with small arms and a careful hunter. Miller had a dog which enjoyed the privilege of the house even to the extent of Miller's bed and cot. Saturday, March 25th, by prearrangement, Miller went to Lafayette to do his shopping for the week. The day was raw and cold. Nicol and Miller arose early, Nicol shaved and then took Miller in his car to Miller's cousin's house about 1/4 mile down the road where he let Miller out to accompany his cousin to Lafayette. Nicol said "so long" and drove out of the drive. Miller did not see which direction he turned. Miller returned from Lafayette that afternoon being let out at the highway in front of his house about 3:00

p.m. It had been snowing since noon. There were no tracks in the snow returning from the road to Miller's house. Miller noticed to his surprise that there was smoke coming from the chimney. Nicol's car was backed close to the barn. Miller went into the kitchen and then into the living room. On the floor lay Nicol on his back with his eyes open. Miller said to him "You had better get up." Nicol mumbled something incoherently. Miller then stepped over Nicol, went into the bedroom, changed his clothes, stepped over Nicol again and went out and did his chores without further conversation. The door between the living room and bedroom was closed and Miller's dog was on the bed. When Miller returned from his chores he again came into the living room where Nicol still lay. Miller said, "You better get up or I'll call the sheriff." Nicol said to call Bob Henderson. Henderson is an undertaker in Lafayette. Miller then asked Nicol what was the matter and Nicol said he was hurt. Miller called the undertaker and told him to bring an ambulance. He turned Nicol on his side at Nicol's request and saw a blood stain on his brown checked shirt about two inches in diameter about two inches immediately below the left nipple. Nicol was lying on his back in the middle of the room, his feet were pointed southeast and his head northwest. The rifle was on the floor south and east of Nicol's feet, three feet away, with the barrel pointed away from Nicol. One load had been fired. There was no overturned or misplaced furniture in the living room. The door to the bedroom where the rifle was kept was closed and the dog was in the bedroom. Nicol was taken to the hospital in Lafayette in shock and was examined by the resident physician who found no powder marks on Nicol's shirt. A .22 caliber slug had entered Nicol's body between the 5th and 6th rib slightly outside of or to the left of the

left nipple line. It had taken a downward course and had lodged in the spinal canal below the point of entry. There were no powder burns around the wound. There were no bruises or scratches on Nicol's body. Nicol died six days later as a result of the rifle wound. There was evidence of experts relating to the manner in which the rifle could have been fired and relating to tests made by them for powder marks at given distances from the muzzle on white cloth. Lt. Robert Borkenstein of the Indiana State Police testified that the end of the muzzle of the rifle would have to be at least fourteen inches away from the body to produce no powder residue on the cloth used in the test, but that the cloth used in the test was not identical with the cloth of insured's shirt. He testified that Nicol could not have voluntarily or deliberately shot himself with the rifle using his own arms and fingers on the trigger without leaving powder marks on his shirt, undershirt, or body. There were no powder burns present and the only way the gun could have been discharged, accidentally or intentionally, was by striking the back of the hammer a blow in the direction of the barrel. He concluded his testimony by saying that the shooting in the manner described could have been accidental or it could have been intentional.

Dewey Nicol was 5 feet 4 inches tall and his shirt sleeve length was 32 inches. Under no possible circumstances could he reach the trigger if it were more than 32 inches from his body. If he had used the rifle himself, and had pulled the trigger with his finger, and with the trigger at any possible distance up to 32 inches from his body, there would have been evidence of powder burns on his skin and around the area of entry of the bullet and powder marks on his shirt and undershirt. None of this evidence was present. The evidence stands uncontradicted that there was no tearing of the tissue in

the chest or body of Dewey Nicol. There were no powder marks on his undershirt and there were no powder marks on his shirt.

All of the evidence shows that there was no wire, stick, or artificial contraption of any kind found near Nicol's body by which he could have fired the rifle. The rifle was found some distance from the body. The only other way the rifle could have been discharged, from the testimony of the experts, was by the hammer of the gun being against the firing pin and being discharged from striking some object in the room. There was little blood around the wound indicating that the bullet entered Nicol's body from a distance from the gun.

The burden of proof in the instant case was upon the appellee to show by a preponderance of the evidence that the case came within the double indemnity clause of the insurance policy sued upon. *Prudential Ins. Co.* v. *Van Wey* (1945), 223 Ind. 198, 59 N. E. 2d 721; *Orey* v. *Mutual Life Ins. Co. of N. Y., supra; Police & Firemen's Ins. Assn.* v. *Blunk* (1939), 107 Ind. App. 279, 20 N. E. 2d 660.

However, it is well settled that facts may sometimes be more firmly established by circumstantial evidence than by direct evidence which is conflicting therewith. *Pennsylvania Ice & Coal Co.* v. *Elischer* (1939), 106 Ind. App. 613, 21 N. E. 2d 436; *McGonigal, Inc.* v. *Etherington* (1948), 118 Ind. App. 622, 79 N. E. 2d 777; *Travelers' Ins. Co.* v. *Nitterhouse* (1894), 11 Ind. App. 155, 38 N. E. 1110; *Supreme Lodge K. of P.* v. *Foster* (1900), 26 Ind. App. 333, 59 N. E. 877; *Metropolitan Ins. Co.* v. *Lyons* (1912), 50 Ind. App. 534, 98 N. E. 824.

The appellant contends that no reasonable inferences can be drawn from the circumstantial evidence in this case to indicate whether the insured shot himself acci-

dentally or intentionally in an act of suicide. The appellant insists that the evidence discloses two alternative possibilities of accident and suicide as contained in the opinion evidence, and that, therefore, to choose from these possibilities means resort to guess and conjecture, upon which a jury's verdict may not be based. The appellant relies mainly upon the following cases in support of its contentions: *Prudential Ins. Co. of America* v. *Van Wey, supra; Orey* v. *Mutual Life Ins. Co. of N. Y., supra; Metropolitan Life Ins. Co.* v. *Glassman* (1947), 224 Ind. 641, 70 N. E. 2d 24. In the foregoing Van Wey and Orey cases, our Supreme Court does announce the rule that a jury cannot choose between two alternative possibilities of accidental death and death from natural causes or infirmities and that the ultimate fact of accidental death must be established by evidence or proper inferences to be drawn from the evidence, and that a finding as to this fact cannot be based upon conjecture, speculation, or guess.

As we view the evidence in the instant case, we have an entirely different situation. In the case at bar, it is conceded that insured's death occurred from external violent means and from an external injury evidenced by a physical wound on his body. There are two mutually exclusive hypotheses as to the death of the insured. The insured's injuries were either intentionally and voluntarily inflicted as an act of suicide in violation of the terms of the insurance policy, or the insured's death was within the terms of the policy. Appellant concedes it would make no difference whether decedent suffered the wound accidently or whether he was murdered as far as the liability of appellant was concerned. Clearly, if the reasonable conclusion to be drawn from the evidence shows only that he might have committed suicide or that he might have suffered an accidental injury resulting

in his death, under the rule announced in the foregoing cases, the jury would have no right to guess or speculate as to which of these two alleged possibilities caused his death.

But, such is not the case when the evidence is examined carefully. A reasonable inference based upon the evidence which the jury could properly make would negative completely the hypotheses of suicide as the cause of death. If the hypothesis that the insured committed suicide is removed, it follows *ipso facto* from the circumstances of his wounding, that he came to his death within the meaning of the double indemnity provisions of the policy. Once the appellee has sustained the burden of proving that the insured's death did not result from suicide, the evidence as to the nature of the wound and the circumstances are so conclusive so that only one inference could be reached by reasonable men as to the death of the insured directly and independently of all other causes from bodily injuries effected solely through external violent and accidental means.

The problem of determining whether a plaintiff has sustained the burden of proving accidental death as distinguished from suicide has produced some confusion in the decisions of the various jurisdictions in this country. Our Supreme Court in transferring a case from this court, *Metropolitan Life Ins. Co.* v. *Glassman, supra,* held in the case of an insured who died from carbon monoxide poisoning in his garage from fumes of an automobile exhaust that "from the evidence of a bruised forehead, the cinders in the mouth of the decedent and the scratches on his hands, the jury could have inferred that he violently came in contact with the floor of the garage and attempted to rise." The court held that the above with all of the other circumstances shown was

sufficient evidence to support an inference of death by accidental means.

An excellent article on the problems of proof in distinguishing suicide from accident is to be found in 56 Yale Law Journal 482-508. The important guiding question in determining whether the burden of proof has been sustained is whether there is substantial evidence from which a logical conclusion may be reached. Some of the factors to be taken into consideration are the physical circumstances of the insured's death and the nature and extent of the wound. The insured's attitude, after he is mortally wounded indicated by remarks, attempts to prevent resuscitation, or, on the contrary, a cooperative attitude toward his recovery may be indicative of his purposes. *Union Central Ins. Co.* v. *Cooper*, 115 F. 2d 222 (CCA 5th, Ala., 1940) ; *Walker* v. *Prudential Ins. Co.*, 127 F. 2d 938 (CCA 5th, Fla., 1942) ; *Edwards* v. *Business Men's Assur. Co.* (1942), 350 Mo. 666, 168 S. W. 2d 82; *Kirschbaum* v. *Metropolitan Life Ins. Co.* (1945), 133 N. J. L. 5, 42 A. 2d 257.

The undisputed evidence in the case at bar shows that the decedent never expressed directly any intention to commit suicide and left no note to his family of that character. The members of his family, his business associates, and friends all testified that he was a normal and happy individual, very much in love with his family and concerned about their welfare. A man contemplating suicide does not plan for his future. Nicol's daughter was to be married shortly, and he had participated in plans for her wedding. He was figuring on new jobs and told his superintendent to come up to his house later on in the week to figure on new work. On Tuesday of the week of his injury he was at his warehouse and checked the equipment. He had started two new jobs. He was friendly and in good health, com-

panionable and agreeable with Miller and with his employees. His first utterance after he was wounded was that he was "hurt." Dr. A. J. Bauer, Chief of the Surgical Staff at the hospital who treated Nicol, testified that Nicol never resisted anything that he attempted to do for him and never exhibited any desire or wish to die. In Dr. Bauer's testimony is contained the following in question and answer: "Did he ever (referring to Nicol) by any word, sign, or gesture of any kind indicate that he had contemplated or attempted to take his own life?" The answer was no. He lived for a week following the accident and was completely cooperative with his doctors and nurses and indicated a normal desire to get well. Prior to his injury he had even failed to pay one insurance premium on a policy on his life for $5000.

The appellant urges that his financial circumstances as set forth in the evidence tend to show he was greatly involved and that an inference might be justified that these circumstances might have caused him to commit suicide. By reason of the more or less extensive nature of his business operations and his reactions to his indebtedness and his circumstances over the years as shown by the evidence, we do not believe such evidence as was presented of his financial circumstances would justify any reasonable inference and conclusion as urged by appellant.

The surmise of the firearms expert that the shooting in the manner described could have been accidental or it could have been intentional was wholly insufficient standing alone to destroy the reasonable inference that the insured did not commit suicide.

From all the other evidence, we believe that the evidence leads inescapably to the conclusion that the jury could have reasonably inferred from the facts that the decedent did not commit suicide or inflict the wound

from which he died voluntarily or intentionally. The appellant concedes that death by disease is not involved, and that death by murder is excluded and would make no difference as to the liability of the appellant. Furthermore, by reason of the fact that from the evidence it was entirely proper for the jury to have reasonably concluded that the hypotheses of death by suicide was negatived, and since the circumstances surrounding the violent external physical wound were clearly sufficient under the holding in the *Metropolitan Life Ins. Co.* v. *Glassman, supra,* to have supported an inference of death by accidental means, the verdict of the jury was sustained by sufficient evidence and is not contrary to law. The lower court did not err in overruling appellant's motion for a new trial, and in denying appellant's motion for a directed verdict for appellant at the close of all of the evidence, and in refusing to give an instruction directing a verdict for appellant.

Judgment affirmed.

DRAPER, J., concurs with opinion.

## CONCURRING OPINION

DRAPER, J.—I concur in the result reached, but I do not believe the decision can be grounded on *Metropolitan Life Ins. Co.* v. *Glassman* (1947), 224 Ind. 641, 70 N. E. 2nd 24.

In that case, as in this one, the question was whether death resulted from accident or suicide. In that case our Supreme Court said: "From the evidence of a bruised forehead, the cinders in the mouth of decedent and the scratches on his hands, the jury could have inferred that he violently came in contact with the floor of the garage and attempted to arise." So a majority of the court apparently felt that from the facts quoted the jury could

infer that the deceased had started the engine, stepped out of the automobile, fallen to the floor, unsuccessfully attempted to arise, and so was accidently asphyxiated. Thus, the court based its holding on the proposition that death by accident was affirmatively inferable from the physical position of the body and its condition and appearance alone.

Such does not seem to me to be the case here. An examination of the evidence persuades me it was entirely impossible for the jury to determine from the position, condition and appearance of Mr. Nichol when Miller found him, and giving full consideration to the setting in which he was found, whether the wound was accidental or self-inflicted. Indeed, it seems impossible to logically reconstruct the occurrence on the basis of either accident or suicide, yet both parties admit the death was not homicidal. So I think a consideration of that part of the evidence just referred to leaves the possibility of accident on an equal footing with the possibility of a self-inflicted wound. That evidence is not sufficient to support an inference of either, and if the evidence went no further the case would have to be reversed under the Van Wey case.

But I do not believe the Supreme Court, by its opinion in the Glassman case, meant to say that the rule of the Van Wey or of the Orey case applies in all cases involving "accident or suicide."

In this court the Glassman case (65 N. E. 2d 503, on rehearing 66 N. E. 2d 76) was affirmed on the theory that where death admittedly or obviously results from accident or suicide, a legitimate inference *sufficient to exclude the hypothesis of suicide* will have strength enough to support a verdict of death by accident. The Supreme Court did not expressly repudiate that theory.

It did transfer the case and affirm on the entirely different theory above mentioned.

The rule of the Van Wey and Orey cases could not be decisive of all cases involving the question of "accident or suicide." For, as pointed out by Judge Bowen, neither of those cases involved a question of "accident or suicide." Both involved a question of "accident or natural causes." In the first class of cases the presence or absence of intent or purpose goes to the very heart of the inquiry, whereas, in the second the question of intent or purpose is not involved. Cases like Van Wey and Orey, which involve "accident or natural causes," and probably some cases involving "accident or suicide," must necessarily stand almost exclusively on the occurrence itself, and an inference must arise, if at all, out of the facts and circumstances immediately surrounding the event. In cases like this more light is available.

Evidence has always been admitted and considered for the purpose of eliminating as well as establishing the presence of motive, intent or purpose. The elimination of one hypothesis will justify a verdict based on another. For example, even in criminal cases the elimination, by circumstantial evidence, of every reasonable hypothesis of innocence will be sufficient to establish guilt. In determining whether the death of an insured was caused by suicide, various factors, including the presence or absence of a motive, the habits and temperament of the insured, his domestic and social environment, and his pecuniary circumstances, as well as the physical facts surrounding death have always been considered to be of the utmost importance. 29 Am. Jur., Insurance, § 1520, p. 1144; *The Travelers' Insurance Company* v. *Nitterhouse* (1894), 11 Ind. App. 155, 38 N. E. 1110.

In the Nitterhouse case the fact that the insured had money and friends; that his domestic relations were

pleasant; that he was sober and industrious; and that he never complained of his bad health were held supportive of the presumption against suicide. In *Sovereign Camp, etc.* v. *Haller* (1900), 24 Ind. App. 108, 56 N. E. 255, the circumstantial evidence strongly indicated suicide by drowning. The insured's domestic relations were exceedingly unhappy; he drank to excess; and the day he disappeared he was sued for divorce and restrained from entering his home. The court said this (and the other evidence introduced) tended to prove the defense of suicide and a judgment in favor of the beneficiary was reversed. On a retrial of that case a number of witnesses who were not called at the first trial furnished additional evidence relating to the habits, conduct and peculiarities of the insured and described the topography of the bank of the stream in which he was drowned. The additional evidence relating to the habits, conduct and peculiarities of the insured was not set out in the opinion but it seems to have been sufficient to sustain the second verdict in favor of the beneficiary, which must have been based on death other than by suicide. *Sovereign Camp, etc.* v. *Haller* (1903), 30 Ind. App. 450, 66 N. E. 186.

In the cases just mentioned the problem was somewhat different, for the burden of proving death by suicide rested on the defendants, but I think they are illustrative of the point I am trying to make.

In this case I do not believe the jury could possibly determine from the physical facts and surroundings alone whether the wound was accidental or self-inflicted. I do believe that other evidence heard by the jury and related in Judge Bowen's opinion was sufficient to justify the jury in finding that, even though the evidence did not indicate the precise manner in which the wound was inflicted, the deceased was without motive, purpose or intent to take his own life. If so, his death was not death

by suicide, however careless or unfortunate he may have been. I think the jury drew that inference; that it furnishes sufficient support for the verdict; and that the verdict should be allowed to stand.

NOTE.—Reported in 86 N. E. 2d 311.