**Linda G. BLYTHE, Plaintiff,**

v.

**KANAWHA INSURANCE COMPANY, OF LANCASTER, SOUTH CARO- LINA, Defendant.**

**Civ. A. No. 2149.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Jan. 31, 1968.

Coble Funderburk, Monroe, N. C., for plaintiff.

Smith & Griffin, Monroe, N. C., for defendant.

### MEMORANDUM OF DECISION

WOODROW WILSON JONES, District Judge.

The plaintiff is a citizen and resident of the State of North Carolina, and the defendant is an insurance company, incorporated under the laws of the State of South Carolina.

On May 10, 1965, Larry F. Blythe, husband of the plaintiff, Linda G. Blythe, purchased a life insurance policy Number 025797 from the defendant, with a face value of $10,000 and a double indemnity rider attached thereto in event the insured should die through external, violent and accidental means. This policy contained a provision that if the insured, whether sane or insane, should die by his own hands or acts, within two years after the date of issuance of the policy,

the liability of the company would be limited to the premiums paid thereon. The plaintiff, Linda G. Blythe, was the named beneficiary.

It is stipulated by the parties that the insured, Larry F. Blythe, died on April 9, 1966, as a result of a self-inflicted gunshot wound. It is agreed by the parties that on the date of the insured's death, the policy was in full force and effect; that the defendant was duly notified, and denied liability under the terms of said policy, contending the insured committed suicide within the two-year period, and tendered return of premiums paid in the amount of $141.00, which plaintiff refused to accept. Plaintiff then instituted this action to collect the face amount of the policy and the double indemnity portion thereof.

The sole question to be determined by this Court is whether the fatal wound was inflicted accidentally or with the intent to commit suicide. After exhaustive consideration of the facts, the Court concludes that death was by suicide.

The deceased and his wife had been married some five and one-half years and were the parents of three small children. The husband and wife were both employed, with the deceased working at Springs Mills, Lancaster, South Carolina, on the 7 AM to 3 PM shift, and the wife working at Bronson Company in Monroe, North Carolina, on the 3 PM to 11 PM shift.

The evidence clearly shows that the family was in a rather precarious financial situation with numerous debts. They had purchased a home with funds derived from a loan from Monroe Savings & Loan Association, which loan was secured by a deed of trust on said home, and a deed of trust on some additional property owned by an uncle and aunt of Larry F. Blythe. The family car was mortgaged to the American Bank & Trust Company, and was in the process of being re-possessed when this tragedy occurred. There were other debts to finance companies which were secured by mortgages on the household and kitchen furniture.

On April 8, 1966, the day before the death, at approximately 7 PM, a Deputy Sheriff of Union County went to the Blythe home to serve Claim and Delivery proceedings on Larry F. Blythe and re-possess the family car which was mortgaged to American Bank & Trust Company securing a loan which was in default. Since Blythe's wife had driven the car to work, the officer agreed for the car to be delivered to him the following day. At about 8 PM on the same day, the deceased went to the plant where his wife was working and informed her of the Claim and Delivery proceedings. When his wife's shift ended at 11 PM that night, instead of returning home immediately, she and two girl friends left Monroe on a trip to Charlotte some 25 miles away. They stopped at the County line and purchased a "six pack" of beer and they drank two cans each. The testimony indicates that they drove around Charlotte for about two hours and returned to their home near Monroe at about 3 AM on April 9, 1966, the day of the tragedy. The wife testified that her husband was asleep when she returned but that as she was undressing for bed he awoke and inquired whether or not she had a good time. She stated that she had his consent to make the trip.

At about 7 AM on the same morning, that is, April 9, 1966, the couple arose and a family quarrel began with the husband complaining about his wife's staying out so late the previous night and the wife complaining of her husband's excessive drinking. The plaintiff testified she told him that she stayed out late that night to let him know how it felt to stay at home and wait for someone, and that he replied to the effect that it did not feel good. They accused each other of being unfaithful, which accusation the wife denied, but the husband neither admitted nor denied. The plaintiff said she normally fixed her husband's breakfast but did not do so on this particular morning because of the family argument.

The deceased left home at about 7:15 AM in the company of his father-in-law

who lived with the couple, for the purpose of changing the tires and battery on the car that was being re-possessed. After the deceased left, the plaintiff went back to bed and slept until about 9 AM when she arose and prepared breakfast for the children. Shortly thereafter the deceased returned home and the evidence indicates that he had been drinking at the time. He departed from his home within a few minutes thereafter and did not return until 1 PM the same day.

The plaintiff testified that when her husband returned home he had been drinking, and accused her of not loving him and she accused him of not loving her. That she and the deceased fought, with him slapping her and she unsuccessfully attempting to slap him. The wife said this was the first time since their marriage that her husband had slapped her. The plaintiff, upset by this fight, left the house and went into the yard and sat down with one of her children. A short time later, the deceased, Larry F. Blythe, came to her and handed her a $20 bill telling her to take the children and leave before he did something for which he would be sorry. The wife said she took the money but told him this was her home and she was not going to leave. The husband returned to the house, got a 12 gauge double barrel shotgun, walked back through the yard, behind the barn.

Miss Emma Lee Ivey, a domestic worker and baby sitter employed by the Blythes, appeared at the home at this time, and testified that she heard a shot which sounded like a shotgun blast, and that Linda G. Blythe, who was sitting in the yard, jumped up and ran in the direction of the shot. She then testified that Mr. Blythe appeared on the hill from behind the barn with a shotgun in his hand and that shortly thereafter he disappeared from her sight, and that Linda G. Blythe suddenly started jumping up and down screaming the words, "No Larry, No", and that she then heard another shot which appeared to be a shotgun blast, coming from the direction where Mr. Blythe had gone. She further testified that Linda G. Blythe called to the

witness to come down there saying, "Larry has done blown his head off", and that when she reached her, Mrs. Blythe said, "I told Larry I did not love him, but I do."

Linda G. Blythe, the plaintiff, was the only eye witness to the actual tragedy. Her version differs somewhat from that of the defense witness, Miss Emma Lee Ivey. Mrs. Blythe testified that after the first shot was fired she waited a few minutes and then got up and went to the barn; that she saw her husband standing beyond and behind the barn and that he stated to her that he just wanted to see if she cared; that at this time he was holding the gun with both hands on the barrel with the barrel pointed upward and the stock toward the ground; that the gun then fired, causing the fatal wound.

The Sheriff of Union County testified that he investigated the death and found the deceased lying on a hillside in an area which had been cleared for a power line right of way; that he was lying on his back, his head uphill, and his feet downhill, with the shotgun below him, the stock at his feet and the barrel pointing in the opposite direction with two empty shells in the chambers. The discharge from the shotgun had entered the left side of the deceased's face and neck. The witness also testified that he investigated the surrounding area which had some shrubs and undergrowth, but there was no evidence that Blythe's feet were entangled or caught in any brush or that the trigger of the gun had caught or entwined on any obstruction. The gun, which had a 26-inch barrel, was tested by the Court as well as by the Sheriff, who testified it was in good mechanical condition and that a jar from a fall of three feet on the hard floor would not cause a discharge even with the safety in the "off" position. The evidence also showed that the deceased hunted often and was familiar with the care and handling of firearms, but the hunting season was not open at this time.

Dr. Geoffrey Thomas Mann, a medical expert specializing in the field of Fo-

rensic Pathology, and the Medical Examiner for the State of Virginia for a number of years, testified as a medical expert that facts substantially the same as these findings would be consistent with suicide and that in his opinion the manner of death of Larry F. Blythe was suicide.

The evidence indicated the deceased was twenty-three years old at the time of his death and was of medium height and weight, and that his wife was twenty-one years of age. The evidence clearly shows that he was burdened with financial as well as marital problems; that he was depressed and in an uncertain state of mind which might lead one to commit such an irrational act as suicide. The deceased was drinking and angry with his wife and had requested her to leave before he did something for which he would be sorry. All of the evidence in this case points unerringly to the conclusion that the deceased committed suicide.

This Court has jurisdiction of this action under Title 28 U.S.C.A. § 1332, since the parties are residents of different States and the amount in controversy exceeds $10,000.

In an action on a life insurance policy with the additional feature of double indemnity for accidental death wherein the Company asserts the defense of suicide, there arises some confusion as to the burden of proof. Here it is admitted that the policy was in full force and effect on the date of death, notice of death properly given, and that the insured, Larry F. Blythe, died on April 9, 1966, within two years of date of issuance of the policy, as a result of a self-inflicted gunshot wound. These facts being admitted, thereby relieving the plaintiff of the burden of their proof, the only issue for determination is whether death was accidental or suicidal.

The rule in North Carolina seems to be clear that where suit is brought on a life insurance policy of general coverage but making suicide an excepted risk, and the facts as set forth above are admitted or proven, the burden would then be on the defendant to establish suicide by a preponderance of the evidence. Stansbury on Evidence, 2nd Edition, § 224. Baker v. Massachusetts Mut. Life Insurance Company, 168 N.C. 87, 83 S.E. 16. The rule is also clear that where an action is brought on a policy which insures only against accident or provides double indemnity for accidental death, the plaintiff must prove the accidental character of death by the greater weight of the evidence, but when he shows the unexplained violent death of the insured, he has at least made out a prima facie case of accident authorizing a finding in his favor on that issue. This does not shift the burden of the issue to the defendant. Stansbury on Evidence, 2nd Edition, § 224. Barnes v. Home Beneficial Life Insurance Company, 271 N.C. 217, 155 S.E.2d 492.

The confusion or difficulty relative to the burden of proof seems to arise because the case at bar combines both features in one law suit. The cases are numerous in which one or the other feature is involved, but it is indeed rare to find a case containing both. The Court's research reveals only one case in North Carolina which involves both features. Wharton v. New York Life Insurance Company, 178 N.C. 135, 100 S. E. 266. Here, the plaintiff may rely upon accidental death by external violence as the basis for the recovery of double the face of the policy, and the defendant may rely on suicide as a defense to the entire claim. In such event, it is clear that the burden of proof rests upon the plaintiff to prove by the preponderance of the evidence that the death was accidental, and upon the Company to bring itself within the protection of the suicide clause. If the Court, as the trier of the facts, is satisfied by the preponderance of the evidence that the death was accidental, then the plaintiff would be entitled to recover under the double indemnity feature of the policy. If, on the contrary, the Court was satisfied by the preponderance of the evidence that the death was suicide, it would enter a verdict in favor of the defendant denying recovery on both features of the case.

But, if the plaintiff fails to prove by the preponderance of the evidence that the death was accidental and the defendant fails to prove by the same preponderance of evidence that the death was suicide, then the plaintiff would be entitled to recover the face amount of the policy because her burden on the general provisions of the policy was met by the admissions of the parties. Judge Soper makes this distinction clear in the case of Jefferson Standard Life Insurance Company v. Clemmer, 79 F.2d 724, 4th Circuit 1935. The same distinction appears to be made in the case of Wharton v. New York Life Insurance Company, supra.

■ The plaintiff's evidence of death by unexplained, external violence, aided by the presumption which arises that death was accidental, "since the law will not presume that the injuries were inflicted intentionally by the deceased", was sufficient to withstand the motion for nonsuit or for dismissal at the close of her evidence and a renewal of the motion at the close of all the evidence, leaving the matter an issue of fact for the determination of the Court, as the trier of the facts. Barnes v. Home Beneficial Life Insurance Company, supra.

The Court is of the opinion that the plaintiff's evidence does not meet the test required of her, that is, to prove accidental death by the preponderance of the evidence, thereby defeating her right to recover on the double indemnity feature of her case.

In fact, when you view the plaintiff's evidence in its entirety, together with that offered by the defendant, you arrive at the inescapable conclusion that the defendant has shown by the preponderance of the evidence that the death was by suicide, and when the defendant has met this burden, he negates liability on the face value of the policy as well as the double indemnity feature thereof.

The Court therefore finds that the plaintiff is entitled to recover of the defendant only the sum of $141.00, plus interest, which represents the total premiums paid by the insured under the policy in question.